Andrew W. Stavros (8615)
Austin B. Egan (13203)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Fax: (801) 893-3573
Email: andy@stavroslaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KALIE BOSKA, an individual, ANGELA CORY, an individual, CHRSTINE DAIMARU, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>WAYFAIR, LLC, a Delaware limited liability company, and WAYFAIR OF DELAWARE, INC., a Delaware corporation,<br><br>Defendants. | **COMPLAINT**<br><br>(JURY DEMAND)<br><br>Case No.: 2:19-cv-00993-JNP<br><br>Judge Jill N. Parrish |

Plaintiffs Kalie Boska, Angela Cory and Christine Daimaru, by and through their counsel, bring this complaint against Wayfair, LLC and Wayfair of Delaware, Inc., pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. ("ADA") and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq. and for causes of action alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  Plaintiff Kalie Boska is an individual who, at all times relevant to this complaint,

resided in Salt Lake County, State of Utah.

2. Plaintiff Angela Cory is an individual who, at all times relevant to this complaint, resided in Salt Lake County, State of Utah.

3. Plaintiff Christine Daimaru is an individual who, at all times relevant to this complaint, resided in Salt Lake County, State of Utah.

4. Wayfair, LLC is a Delaware limited liability company doing business in Utah County, State of Utah and conducting business for and on behalf of Wayfair of Delaware, Inc., a corporation of the State of Delaware (Wayfair, LLC and Wayfair of Delaware are hereinafter collectively referred to as "Defendant" or "Wayfair").

5. At all times relevant to this complaint, Wayfair was an employer (or covered entity, as applicable) within the meaning of the ADA 42 U.S.C. §12111(5).

6. At all times relevant to this complaint, Plaintiffs were each an employee of Wayfair within the meaning of the ADA §12111(4).

7. Jurisdiction is proper before this Court pursuant to 28 U.S.C. §1343(4).

8. Venue is proper in this District pursuant to 28 U.S.C. §1391(b).

## FACTUAL BACKGROUND

**Plaintiff Kalie Boska**

9. Plaintiff Kalie Boska ("Boska") was hired by Wayfair as a Team Manager on or about October 19, 2015. Plaintiff was later terminated by Wayfair on or about November 1, 2018.

10. From 2015-2017, Boska performed her duties exceptionally well and received performance reviews that were good and met or exceeded Wayfair's job expectations.

11. During this time, Boska regularly received pay increases and had no oral or written performance deficiencies. By all accounts, Boska was an exceptional employee who met or exceeded all Wayfair's expectations.

12. On or about October 27, 2016, Boska had an attack at work that resulted in a severe amount of pain. Boska notified Kim Orehoski ("Orehoski"), the Director, that she would be leaving approximately 30 minutes prior to the end of her shift.

13. Boska's pain continued throughout the evening and at 3:00 a.m. on October 28, 2016, she travelled to the hospital and was admitted until 5:00 a.m. the same day. While at the hospital, Boska kept Orehoski informed of her condition.

14. At this time, Boska requested to work from home because the pain she was in. Orehoski denied her request for an accommodation and instead suggested that Boska "lay in her car" or in the "health room" to rest on breaks and lunch.

15. Boska's medical provider later requested that Boska be placed FMLA leave and Short-Term Disability. Boska submitted a request for FMLA leave and she was approved and she remained on FMLA from October 28, 2016 until on or about December 1, 2016.

16. While on leave, Boska was contacted by Orehoski. Orehoski stated that it was Boska's responsibility to ensure her duties were covered while she was on leave, including coaching her team and sending stat updates.

17. Orehoski violated Boska's right to FMLA leave when she contacted Boska while she was on leave and requested that she work. Additionally, Boska was in a severe amount of pain and could barely move out of bed and as a result was unable to complete Orehoski's request.

18. On or about December 1, 2016, Boska returned to work. Upon her return to work, Boska discovered no one had been assigned to manage her team while she was on leave.

19. Later, Boska met with Miles Dunn ("Dunn"), her new manager. During the meeting Dunn told Boska that he "didn't want the stuff he was told to taint his opinion about her, he wanted to form his own opinion."

20. On or about December 6, 2016, Boska received an email from Orehoski requesting a meeting. Orehoski, Boska and a representative from the Human Resources Department were present for the meeting. During the meeting, Boska discussed her upcoming EUD Scope Procedure. Orehoski questioned Boska regarding the procedure and the length of time she would need to recover. Orehoski continued to interrogate Boska about her medical condition and requested personal and otherwise confidential information from Boska regarding her medical condition.

21. The following day, Boska's medical provider requested FMLA leave for Boska in order for her to undergo the EUS Scope procedure. Boska's medical doctor requested the leave include two (2) weeks of consecutive time-off and after the two (2) weeks that Boska be approved for intermittent leave in case she had a flare-up of her symptoms.

22. Shortly thereafter, Boska met with Dunn on or about December 9, 2016 and was given a disciplinary 30-day plan ("PIP"). Dunn advised Boska that FMLA was "not for going out" or "to party" or "going to Christmas parties." Dunn continued and stated that other managers felt that Boska was "slacking due to not being in the office" or "working while out on medical leave." Boska was later given a copy of the PIP.

23. Prior to taking FMLA leave, Boska had exceptional performance ratings and

never received any disciplinary actions.

24. On or about December 19, 2016, Boska met with Michelle Erickson and Whit Faleseu from the Human Resources Department regarding her upcoming FMLA leave. Ms. Erickson informed Boska that she could not take two (2) weeks of leave and intermittent leave. Instead, Boska was only allowed to take either the two (2) weeks of leave or intermittent leave. Boska requested that she be approved for the two (2) weeks of leave because her FMLA was scheduled to commence the following day. When Boska questioned as to why she could not be placed on intermittent leave she was informed this was due to the fact that she did "not have a diagnosis."

25. Boska was ultimately approved for the two (2) week FMLA leave. Boska remained on leave from December 20, 2016 until January 4, 2017.

26. Boska returned to work on January 4, 2017.

27. Shortly thereafter, on or about January 6, 2017, Boska received a final written warning from Dunn and Orehoski. Boska was informed she was being written up because she "did not hold her team accountable while they were on development plans" and that she did not move the team members to final written warnings during the three (3) weeks prior to going on leave.

28. Orehoski and Dunn once again knowingly and intentionally retaliated against Boska for taking FMLA leave by giving her an unwarranted written warning.

29. Shortly thereafter, Boska had a personal conversation with Dunn. During the conversation Dunn stated, "Do you love your job, because if not I could help you find a job you would enjoy." Boska responded stating, "Yes, I love my job, I love the people I work with but most of all I love my team."

30. On or about January 12, 2017, Boska was forced to change schedules and work on a less favorable night shift. Boska was also reassigned to another team by Orehoski and Dunn.

31. Orehoski and Dunn continued to retaliate against Boska, including placing Boska on a less favorable shift, reassigning her to a new team and giving her an unwarranted final written warning upon her return from FMLA leave.

32. On or about January 26, 2017, Boska submitted a formal complaint regarding the differential treatment and retaliation she was subjected to by Orehoski and Dunn.

33. In response to her Complaint, Boska spoke with William in the Human Resources Department.

34. On or about January 31, 2017, Boska spoke to William to discuss her complaint. William found that the treatment Boska was receiving from Orehoski and Dunn was unfair and Boska was ultimately allowed to move back to her previous shift, however, Boska was forced to continue to oversee the new team she was assigned.

35. On or about August 10, 2017, Boska was diagnosed with Hodgkin's Lymphoma.

36. Hodgkin's Lymphoma is a rare cancer that affects the blood and causes severe symptoms, including fever, fatigue, night sweats, unexplained and rapid weight loss, itching spells, and other debilitating symptoms.

37. Shortly after being diagnosed, Boska requested a leave of absence in order to undergo treatment, including chemotherapy.

38. Boska requested FMLA leave on or about October 23, 2017 and was granted FMLA leave from November 1, 2017 to May 1, 2018.

39. On or about May 1, 2018, Boska was cleared by a doctor to return to work.

40. Immediately after returning to work, Boska was subjected to differential treatment from Orehoski and Lani Watson ("Watson"), her manager.

41. Boska met with Mikki Webb ("Webb"), her direct manager, on or about May 17, 2018. During the meeting, Webb stated that Orehoski intended to place Boska on a Disciplinary Development Plan because Boska had been on leave and needed to "come up to speed" on her responsibilities.

42. Shortly after the meeting, Webb was terminated on or about May 21, 2018 and Boska was reassigned to Watson's team.

43. Two (2) weeks later, Boska was assigned a team of consultants, all which had recently completed training.

44. In or about June 2018, Boska had a coaching session with Watson wherein Watson stated that Boska was "successful" and was "reaching her goals for her team". However, in or about July 2018, Boska received a formal review from Watson with an "unsatisfactory" rating. The review further stated that Boska was given an "unsatisfactory" rating due to the fact that her team had not reached 100% in their statistics for May 2018.

45. Given the circumstances, Boska had only approximately two (2) weeks to assist her new team of consultants in reaching 100% for their statistics for the month of May, 2018, because of her prior leave.

46. In or about August 2018, Boska was a witness to an argument between a manager and a consultant regarding Wayfair policy. After overhearing the argument for several minutes, Boska requested that the manager and consultant leave the floor and further address the issue in a conference room so other consultants were able to continue working without further distraction.

47. Immediately after Boska's request, the consultant began to argue with Boska. Shortly thereafter, the consultant was convinced to leave the floor and continue the conversation

with other managers.

48. Immediately following the incident, Boska's senior manager, Brenna Hendricks, questioned Boska about the incident. Boska was forthright and notified the manager that she had attempted to mediate the situation and otherwise help to convince the consultant to continue the argument in a conference room, due to the fact that the consultant was becoming a distraction to other employees.

49. Despite doing nothing wrong, Boska was given an unwarranted final written warning for engaging an "argument" with the consultant.

50. Prior to the above incident, Boska had never received any disciplinary actions.

51. In or about August 2018, Boska was reassigned to a new manager, Logan Weber ("Weber").

52. On or about September 18, 2018, Boska met with Weber to discuss his expectations and to further assess and review her team's statistics. During the meeting, Boska was made aware that Orehoski once again intended to place her on a Disciplinary Development Plan due to the fact that the statistics for her team for the previous months were not at 100%.

53. In response, Boska informed Weber that her team had obtained a 94% rating for the month of August 2018 and 99% rating for the month of September 2018, and that Orehoski's request to place her on a Development Plan was unwarranted and unnecessary.

54. On or about October 2, 2018, Weber sent a copy of Boska's statistics to a team analyst to review. Upon further review of Boska's statistics, Weber agreed that the Development Plan was not necessary. Weber immediately contacted Orehoski and explained his findings and expressed that he did not believe Boska should be placed on a Development Plan. Reluctantly Orehoski agreed and instead demanded that Boska be given a verbal warning.

55. Boska was on track to meet and obtain all of the necessary requirements that were

outlined by Weber. In fact, on or about November 1, 2018, Boska was notified that she had successfully reached 100% for her statistics for the month of October.

56. Shortly thereafter, Boska was contacted by the Human Resources Department and informed that Orehoski had requested to meet with her.

57. During the meeting Orehoski notified Boska that she was terminated. Orehoski stated Boska was terminated for a "note" she had written regarding an applicant for a position she had interviewed in or about July 13, 2018.

58. Boska informed Orehoski that the applicant was not hired due to the fact that his ideals did not align with the company's culture, and she had not engaged in any discrimination. Rather, the applicant had made discriminatory comments during the interview, including remarks such as being more experienced than the "younger generation" and that the "younger generation never knew what they were doing."

59. Orehoski responded stating that she had trained everyone on the interview process and of the importance of not putting anything in interview notes that may be misconstrued as discriminatory. The note, however, was not discriminatory and Boska reminded Orehoski that the interview training had not occurred until September 2018, approximately two (2) months after the incident, and did not give instructions on how to deal with this type of issue.

60. Boska was ultimately terminated on or about November 1, 2018.

**Plaintiff Angela Cory**

61. Plaintiff Angela Cory was hired as a Customer Service Representative by Wayfair in or about August, 2014.

62. Cory was promoted to team manager in or about September 2015.

63. Cory was later terminated on or about November 1, 2018.

64. From 2014-2017, all of Cory performance reviews were good. Cory regularly

received pay increases and upon information and belief, Cory had no oral or written performance deficiencies. By all accounts, Cory was an exceptional employee who met or exceeded all Wayfair's expectations.

65. Because Cory was a team manager, Wayfair required Cory to coach members of her team on work related matters, including performance and/or personal matters that required the attention of Wayfair Human Resources.

66. As part of Cory's job duties, she was required to participate in interview of candidates for positions with Wayfair. As such, Cory kept detailed notes regarding the interview and the decision to employ the potential applicant.

67. In or about July-August 2018, Cory interviewed a male candidate that made several discriminatory comments during the interview. His comments included racial comments about Mexicans and about younger employees, including the "the younger generation." During the interview, Cory added into her notes the comments made by the applicant and the reasons for her decision not to hire him.

68. On a separate occasion, Cory interviewed an older male. Cory made the decision to hire him for the position. Cory later discovered he was involved in a court case, at which time she recommended that he address his ongoing court case before being hired.

69. Shortly thereafter, on or about, July 2018, Cory was diagnosed with pre-cancerous cells on her uterus and was required to have a hysterectomy in order to relieve her symptoms.

70. In or about August 2018, Cory requested and was approved from FMLA Leave in order to undergo surgery.

71. Cory's FMLA leave commenced on or about September 1, 2019.

72. On or about October 16, 2018, Cory returned to work following her FMLA leave.

73. On or about November 1, 2019, Cory was contacted by Brenna Heidrik ("Heidrik"),

10

Kim Orehoski ("Orehoski"), and the Human Resource Team, by phone. During the conversation, Heidrik informed Cory she was terminated from her position due to including employee's medical information into her personal notes and also writing "age discrimination" in her personal notes regarding a potential employee.

**Plaintiff Christine Daimaru**

74. Plaintiff Christine Daimaru ("Daimaru") was hired by Wayfair as an Inbound Email Customer Service Representative on or about October 19, 2015.

75. Daimaru was later terminated on April 2, 2019.

76. From 2015-2018, all of Daimaru's performance reviews were good. Daimaru regularly received pay increases and had no oral or written performance deficiencies. By all accounts, Daimaru was an exceptional employee who met or exceeded all Wayfair's expectations.

77. In or about June 2015, Daimaru was diagnosed with severe food allergies. In addition to being diagnosed with severe allergies, Daimaru also had a Cholecystectomy, a surgery to remove her gallbladder, and a hiatal hernia.

78. Because of her condition, Daimaru suffers from severe symptoms that include stool urgency and diarrhea forcing her to take frequent bathroom breaks or time off work, if needed.

79. In or about August 2018, Daimaru requested and was approved for intermittent FMLA through February, 2019.

80. While on FMLA leave, Daimaru received a final written warning from her manager, Michael O'Day, falsely accusing her of "stealing time" due to not clocking in and clocking out when using FMLA during the day.

81. As stated previously, Daimaru had not received any verbal or written warnings. Instead Wayfair intentionally and knowingly penalized Daimaru for rightfully using leave as permitted by the FMLA.

82. Following this incident, Daimaru submitted paperwork to renew her FMLA leave in or about February 2019. Subsequently, Daimaru was approved for intermittent FMLA leave through April 2019.

83. On or about April 2, 2019, Daimaru received a call via Skype from Michael O'Day, Team Lead, and Al Edwards, Manager of Talent Management, to discuss her FMLA status and to follow up Daimaru on entering her time for the dates she used FMLA. During the phone call, Mr. Edwards belittled and harassed Daimaru regarding her rights under FMLA and what she was allowed to do pursuant to her FMLA leave.

84. Mr. O'Day then proceeded to make false allegations regarding Daimaru's use of her FMLA leave. Mr. O'Day stated that in Wayfair's computer system her status had shown "not ready" for several days throughout the month. Mr. O'Day continued to allege that during the "not ready" status the system was not showing that she was working on anything for approximately 8-15 minutes at a time.

85. In response, Daimaru stated that she had, in fact, been working during these short periods of time and further maintained that she had been told to "clock-out" when she was on FMLA. Mr. O'Day then alleged that her calls were not being recorded during these small increments of time and due to the fact that she had already been placed on a final written warning, she would be terminated.

86. Plaintiff was terminated on or about April 2, 2019 for "work avoidance.

87. Wayfair's proffered reason for terminating Plaintiffs are pretextual, including that they are demonstrably false and a subtext to hide the real motivations for Plaintiff's terminations

that Plaintiff was being terminated for exercising her right to FMLA.

88. Prior to using FMLA, Plaintiffs were valued employees with positive track records, including raises and promotions. In addition, Plaintiffs had not received any significant disciplinary actions and otherwise excelled in their respective positions. As such, Plaintiff was terminated because of her need for leave to manage the symptoms of her disability.

89. Wayfair sought out reasons to terminate Plaintiffs due to their conditions and/or FMLA leave, and, on information and belief, Wayfair engaged in a pattern and practice of denying Plaintiff's and others their rights to FMLA and/or retaliating against them because of their exercise of their rights under the FMLA.

90. Further, on information and belief, instead of protecting employees' rights to FMLA leave and/or ADA accommodations, Wayfair knowingly and intentionally implemented a company-wide practice that required any team member to avoid "keeping notes" and/or a record of any medical conditions of any employee in order to obstruct its true intentions of eliminating any personnel that had requested and/or exercised their right to FMLA leave and/or an ADA accommodation.

91. For example, on several occasions between 2016 and 2018, Cory attended various group meetings with Human Resources wherein management and representatives from Human Resources teams discussed employees that were exercising and/or had requested FMLA Leave or an ADA accommodation.

92. Wayfair viewed such employees negatively, solely due to their need for FMLA leave and/or requests for accommodations.

93. Wayfair intentional discriminated against Plaintiffs because of their exercise of the rights under the FMLA and/or ADA, as applicable.

**FIRST CAUSE OF ACTION**
**(Violation of the ADA- Discrimination - Plaintiff Boska)**

94. The preceding paragraphs are incorporated herein by reference.

95. At all times relevant hereto, Boska was an employee of Wayfair as defined in §12111(4) of the ADA.

96. At all times relevant hereto, Wayfair was a covered entity as defined in §12111(5) and §12112(b) of the ADA.

97. Boska was disabled within the meaning of the ADA in that he had a disability, a record of a disability and/or was regarded as having a disability that substantially limited major life activities within the meaning of the ADA, 42 U.S.C. § 12102(1).

98. At all times relevant hereto, Boska was qualified to perform the essential functions of his job and did in fact perform the essential functions of his job with Wayfair, without reasonable accommodation.

99. The ADA prohibits discrimination against an individual because of disability, a record of a disability or being regarded as disabled.

100. Wayfair knew Boska had a disability when it was informed of Boska's health issues and her need for an accommodation, when Boska was out on leave, and when she returned to work following her leave.

101. Wayfair discriminated against and denied Boska because of her disability, record of disability, and/or regarded as disability.

102. As a result, Boska suffered significant damages, including the loss of pay and benefits, and other employment related compensation she missed because of Wayfair's unlawful termination.

103. Because of Wayfair's actions, Boska is also entitled to recover compensatory

damages in an amount to be proven at trial, including non-pecuniary losses for emotional distress, pain and suffering, humiliation and related damages, in an amount determined by the tier of fact, plus attorney's fees and costs incurred in bringing this action.

104. Wayfair's conduct toward Boska was willful and malicious and manifested a knowing and reckless indifference toward, and disregard of, Boska's interests and rights, entitling Boska to an award of punitive damages.

### SECOND CAUSE OF ACTION
### (Violation of FMLA – Discrimination / Retaliation – All Plaintiffs)

105. Boska incorporates the allegations in the preceding paragraphs as if fully set forth herein.

106. The FMLA, 29 U.S.C. § 2612, provides that an eligible employee is entitled to take up to twelve (12) weeks of leave during a twelve (12) month period because of the employee's serious health condition.

107. Generally, an employee is eligible for leave under the FMLA, 29 U.S.C. § 2611(2), after being employed during at least twelve months and having not less than 1250 hours during such qualifying period.

108. The FMLA, 29 U.S.C. § 2614(a), provides that an employee who takes leave must be restored to his former position or an equivalent position when he returns from leave.

109. The FMLA, 29 U.S.C. § 2615(a)(2), prohibits an employer from discriminating and/or retaliating against an employee for taking FMLA leave or engaging in another protected activity.

110. As alleged more fully above, Plaintiffs were terminated in retaliation for exercising their rights to FMLA leave.

111. Wayfair willfully and intentionally discriminated against Plaintiffs for taking

15

such leave, or exercising their rights to take such leave, and did so knowingly and intentionally and with reckless disregard of Plaintiffs' rights under the FMLA.

112. Wayfair's termination of Plaintiffs violated the FMLA and, pursuant to 29 U.S.C. § 2617, and Wayfair is liable to Boska for all wages and wage increases to which he would have been entitled but for Wayfair's conduct, including salary, profit sharing, employee benefits and other compensation which they lost due to Wayfair's violation of the FMLA.

113. Wayfair is also liable to pay Plaintiff for liquidated damages equal to their lost pay and benefits, or in lieu of liquidated damages, prejudgment interest on those losses, plus reasonable attorney's fees, reasonable expert witness fees and any other costs of this action, and for such other and further equitable relief as the Court deems appropriate (including reinstatement, employment and/or promotion), and as otherwise allowed under the FMLA.

### THIRD CAUSE OF ACTION
**(Violation of Section 510 of ERISA – 29 U.S.C. – All Plaintiffs)**

114. The preceding paragraphs are incorporated herein by reference.

115. During their employment Plaintiffs received group health benefits from Wayfair which benefits were covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. ("ERISA").

116. ERISA, 29 U.S.C. § 1140, prohibits Wayfair from interfering or otherwise retaliating against Plaintiffs for exercising their protected rights under the plans which it established and allowed Plaintiffs to participate in, including discriminating against Plaintiffs for exercising any rights they are entitled to under the plans, or for the purposes of interfering with the attainment of any rights they may become entitled to under the plans.

117. While employed by Wayfair, Plaintiffs were entitled to receive and did receive employee health benefits under an employer sponsored plan governed by ERISA, including

specifically health benefits offered through Wayfair's employer sponsored health plan that existed during Plaintiffs' employment.

118. Plaintiffs' termination of employment was for the purpose of interfering with their respective use and continued use of such plan benefits, including the benefits they needed for the health issues and serious health conditions identified above.

119. As a proximate result of Wayfair's actions, Plaintiffs are entitled to restitution in an amount to be determined at trial, benefit costs incurred by each of them, attorney's fees and costs, and such further equitable relief as the Court deems appropriate, including injunctive relief and/or reinstatement to his former position.

120. Plaintiffs are further entitled to an award of their attorney fees incurred in bringing this action.

## JURY DEMAND

Plaintiffs request trial by jury on issues so triable to jury pursuant to Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Wayfair as follows:

1. For judgment in Plaintiffs' favor and against Defendants for violation of the ADA and FMLA, as applicable;

2. For an order awarding Plaintiffs all lost wages, compensation and other economic benefits lost as a result of Defendants' actions and omissions, including back pay and front pay (in lieu of reinstatement), and other pecuniary and non-pecuniary damages, as applicable under Plaintiffs' separate claims;

3. For an order awarding Plaintiffs liquidated damages as allowed under the FMLA in an amount to be proven at trial;

4. For an order awarding Plaintiff Boska compensatory damages, including damages for emotional distress, pain and suffering, humiliation and loss of reputation and career, in an amount to be determined a trial, for her claim under the ADA;

5. For an order awarding Plaintiffs pre- and post-judgment interest as applicable;

6. For an order awarding Plaintiffs attorney fees and costs of suit, including expert witness fees, incurred in bringing this action, as applicable;

7. For an order awarding punitive damages, as applicable; and

8. For and order awarding such further and additional legal or equitable relief as the Court deems appropriate.

DATED this 20th day of January, 2019.

/s/   **Andrew W. Stavros**
Andrew W. Stavros
STAVROS LAW P.C.
*Attorneys for Plaintiffs*