Andrew W. Stavros (8615)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Fax: (801) 893-3573
andy@stavroslaw.com

*Attorneys for Plaintiffs Kalie Boska and Angela Cory*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| KALIE BOSKA, an individual, and ANGELA CORY, an individual, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| vs. | Case No. 2:19-cv-00993 |
| WAYFAIR, LLC, a Delaware limited liability company, and WAYFAIR OF DELAWARE, INC., a Delaware Corporation, | Judge: Jill N. Parrish |
| Defendants. | Magistrate Judge: Cecilia M. Romero |

---

Plaintiffs Kalie Boska ("Boska") and Angela Cory ("Cory"), by and through their

counsel, and pursuant to Fed. R. Civ P. 56 and DUCivR 7 and 56, submit this Memorandum in

Opposition to Defendants (collectively "Defendants" or "Wayfair") Motion for Summary

Judgment.

# **TABLE OF CONTENTS**

INTRODUCTION AND RELIEF REQUESTED ........................................................................ 1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS ..... 1

PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS THAT SUPPORT .......................... 26

DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ................................. 26

   I.    BOSKA .................................................................................................................... 26

      A.    Boska's Disabilities and Requests for FMLA .......................................... 26

      B.    Boska's qualifications for her position at Wayfair .................................. 27

      C.    Adverse actions taken against Boska after exercising her right to FMLA leave ....... 28

      D.    Boska's complaints of discrimination and retaliation ................................. 30

      E.    Boska's denial of accommodation ............................................................ 31

      F.    Wayfair's denial permitting Boska to exercise her FMLA leave .............................. 32

   II.    CORY ....................................................................................................................... 33

      A.    Cory's disabilities and requests for FMLA .............................................. 33

      B.    Adverse actions taken against Cory after taking FMLA leave .................................. 33

   III.    BOSKA AND CORY'S TERMINATION, LOSS OF BENEFITS AND  EMOTIONAL DISTRESS. .................................................................................................................... 34

      A.    Wayfair's failure of training Boska and Cory. ......................................... 34

      B.    Wayfair's proffered reasons for Boska and Cory's termination are false and    instead in retaliation for participating in a protected activity ........................................... 36

      C.    Boska and Cory's termination. ................................................................. 37

SUMMARY JUDGMENT STANDARD ................................................................................ 37

ARGUMENT .......................................................................................................................... 39

   I.    PLAINTIFFS' FMLA CLAIMS ARE SUPPORTED BY THE EVIDENCE ................... 39

      A.    Plaintiffs' Claims are Not Time-Barred .................................................. 39

      B.    Plaintiffs Can Establish Wayfair Violated the FMLA ................................. 42

         i.    Materially Adverse Action ................................................................. 43

         ii.    Causal Connection ............................................................................. 47

         iii.    Pretext ............................................................................................... 50

   II.    BOSKA'S ADA CLAIMS ARE SUPPORTED BY THE EVIDENCE ........................ 54

CONCLUSION ....................................................................................................................... 57

# TABLE OF AUTHORITIES

## Cases

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). ........................................... 38
*AMTRAK v. Morgan,* 536 U.S. 101, 113, 122 S. Ct. 2061, 2072 (2002) ..................................... 39
*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) .................................... 43
*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004)..................................................... 43
*Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008) ............................................................ 39, 40
*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1122 (10th Cir. 2001)................................ 51
*Burlington*, 548 U.S. at 69-70 ....................................................................................................... 44
*Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)............................ 43
*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003) .......................................... 54
*Dewitt* v. *Southwestern Bell Telephone Co.,* 845 F.3d 1299, 1318 (10th Cir. 2017) .................. 52
*Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005)................................. 55
*E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000)................. 43
*Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) ................................ 50
*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)...................................... 47
*Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).................................. 44
*Hibben v. Potteiger*, No. 16-CV-111-JFJ, 2019 U.S. Dist. LEXIS 6335, at *13-14 (N.D. Okla.
    Jan. 2019) ................................................................................................................................ 43, 44
*Horizon/CMS Healthcare Corp.*, 220 F.3d at 1197 .................................................................... 43
*Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1310 (10th Cir. 2005)................................... 51
*Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) ............................... 51
*Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000)...................... 51
*Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) ............................................ 44
*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)...................................... 38
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................................... 42
*Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005) ................................ 44, 45
*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) ........... 42, 47
*Minshall v. McGraw Hill Broad. Co.,* 323 F.3d 1273, 1281 (10th Cir. 2003) ............................ 50
*Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998)............................ 44, 56
*Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 538 (10th Cir. 2014) ....................................... 42
*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n. 4 (10th Cir. 2013) .................................................. 43
*Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253(1981)............................................... 43
*Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159 (10th Cir. 2008)..................................................... 53
*Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007)....................................... 50

## Statutes

29 U.S.C. § 2617(c) ....................................................................................................................... 39
42 U.S.C. § 12112(a) ..................................................................................................................... 54

## Rules

DUCivR 7 and 56................................................................................................................................ i
Fed. R. Civ P. 56 ............................................................................................................................... i
Fed. R. Civ. P. 56(a). ..................................................................................................................... 38

## INTRODUCTION AND RELIEF REQUESTED

Plaintiffs were both victims of discriminatory and retaliatory actions perpetrated by Defendants in order to terminate their employment. For the reasons that will be set forth herein, Plaintiffs request that this Court DENY Defendants' Motion for Summary Judgment in its entirety because there exist genuine disputes of material fact that Wayfair's decision to terminate Plaintiffs was in retaliation for exercising their rights under the Family and Medical Leave Act, that Wayfair discriminated against Plaintiff Boska in violation of the Americans with Disabilities Act, and that Wayfair proffered reasons for their termination were simply pretextual. Wayfair unfairly and in violation of federal law harassed, threatened, and discriminated against Plaintiffs for using their leave time, actively sought to have them terminated, and discriminated against them on the basis of their medical disabilities.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Boska and Cory respond to Defendants' statement of facts ("SOF") below.  As noted in the argument, many of Defendants' SOF's are unsupported by the evidence or construe the evidence in light most favorable to the Defendants and draw inferences in their favor, which is improper at summary judgment.[1]  Subject to the foregoing, Boska and Cory dispute the following facts for purposes of this motion:

**Defendants' SOF No. 2:**  *Wayfair maintains strict policies forbidding discrimination, harassment, and retaliation.  Wayfair communicates these policies, as well as a complaint procedure to its employees.  Ex. 2, Cory Dep. 30:18-31:16; 31:18-32:9; Ex. 3, Boska Dep. 48:21-50:3; Ex. 4, Relevant Policies, EEO, Harassment, Reporting and Retaliation.  Employees who violate these rules may be subject to corrective action, including immediate discharge.  Ex. 4 at p. 1 (WAYFAIR000440).*

**RESPONSE:  Disputed in part.**  Boska and Cory dispute that the policies listed in the

---

[1] Boska and Cory reserve the right to contest any SOF not disputed herein at any time, including at a subsequent trial.  Facts that are undisputed are only undisputed for purposes of this opposition and Boska and Cory reserve the right to contest any facts not disputed herein at a later date.

handbook produced by Wayfair were applicable to their employment.  Specifically, the employee

handbook cited by the Wayfair is dated April 2019.[2] Plaintiffs do not dispute the deposition

testimony referenced by Wayfair. However, that testimony does not support the facts alleged.

**Defendants' SOF No. 3:**  *Wayfair's EEO policy states, "[a]ny employee who believes he or she has been submitted to any form of unlawful discrimination or other violation of this policy is encouraged and expected to notify Talent management immediately." Ex. 4 at p. 2 (WAYFAIR000441).   The EEO policy further states, "[a]ny employee with a disability who requires an accommodation to perform essential functions of the job should contact a Talent Management Representative to request an accommodation." Ex. 4 at p. 1 (WAYFAIR000440).*

**RESPONSE:  Disputed.**  The employee handbook produced by Wayfair does not apply

to the employment of Boska and Cory as it was revised, edited, modified, altered, and changed as

of April 2019, which was after Boska and Cory were terminated from their employment on

November 1, 2018, including the Equal Opportunity Policy set forth therein.[3]

**Defendants' SOF No. 4:**  *Wayfair also maintains a policy governing FMLA leaves of absences. Ex. 3, Boska Dep. 52:18-23; Exhibit 5, FMLA Leaves of Absences Policy.*

**RESPONSE:  Disputed in part.**  The employee handbook produced by Wayfair does not

apply to the employment of Boska and Cory as it was revised, edited, modified, altered, and

changed as of April 2019, which was after Boska and Cory were terminated from their employment

on November 1, 2018, including the FMLA Policy set forth therein.[4] Plaintiffs do not dispute the

cited deposition testimony from Boska, but such testimony does not support this statement of fact.

**Defendants' SOF No. 5:**  *Wayfair's Retaliation policy, which is contained in the Employee Guide states, "All employees who experience or witness any conduct they believe to be retaliatory should immediately follow the reporting procedures stated above (Reporting Procedures). Wayfair's Reporting Procedures Policy states, "[i]f you feel you have experienced or witnessed any conduct that is inconsistent with this policy, you are to immediately notify Talent Management or any member of the Management team."  Plaintiffs both understood that if they felt they had been unfairly retaliated against by another employee or manager, they should report it to Wayfair Talent Management. Boska Dep. 101:21-103:3; Cory Dep. 31:18-32:9; Exhibit 4).*

---

[2] See Plaintiff's Exhibit 1, Wayfair Employee Guide. P. 1, Version date: April 2019, at p. 1.
[3] See Plaintiffs' Ex. 1 at p. 1; see also Plaintiffs' Exhibit 3, Cory Dep., 43:6-20; Plaintiff's Exhibit 2, Boska Dep., 150:20-24.
[4] Plaintiffs' Ex. 3, Cory Dep., 43:6-20; Plaintiffs' Ex. 2, Boska Dep., 150:20-24.

**RESPONSE:  Disputed in part.**  The employee handbook produced by Wayfair does not apply to the employment of Boska and Cory as it was revised, edited, modified, altered, and changed as of April 2019, which was after Boska and Cory were terminated from their employment on November 1, 2018, including the retaliation policy set forth therein.[5] Plaintiffs do not dispute the cited deposition testimony, however, that testimony does not support the facts alleged.

**Defendants' SOF No. 6:** *The Wayfair Code of Conduct defines misconduct as "[a]ctions detrimental to the best interest of Wayfair.  Such actions include any action which impairs the public reputation of the organization of individual staff members or any action which impairs successful operation of Wayfair." Exhibit 16, Wayfair Code of Conduct.  Violations of the Wayfair Code of Conduct may result in appropriate disciplinary action, up to and including immediate discharge. Id.*

**RESPONSE: Disputed.**  The employee handbook produced by the Wayfair does not apply to the employment of Boska and Cory as it was revised, edited, modified, altered, and changed as of April 2019, which was after Boska and Cory were terminated from their employment on November 1, 2018, including the Code of Conduct set forth therein.[6]

**Defendants' SOF No. 7:** *Plaintiffs received the Employee Guide, were aware of Wayfair's EEO policy, anti-discrimination, anti-retaliation, and FMLA leave policies, and acknowledged receipt of the same during their employment. Ex. 3, Boska Dep. 47:9-48:14, 46:19-47:8; 48:21-50:11; 52:18-54:1; Exhibit 6, Cory Acknowledgment of Wayfair's Policies Executed August 18, 2014; Exhibit 18, Boska Acknowledgement of Wayfair Policies Executed October 20, 2015.*

**RESPONSE:  Disputed in part.**  Plaintiffs do not dispute that they received a copy of the Employment Handbook in effect in 2014 and later in 2015, as shown by the signed acknowledgments.[7]  However, the employee handbook produced by Wayfair does not apply to the employment of Boska and Cory as it was revised, edited, modified, altered, and changed as of April 2019, which was after Boska and Cory were terminated from their employment on November

---

[5] *Id.*
[6] See Plaintiffs' Ex. 1 at p. 32; see also Wayfair Ex. 16.
[7] See Wayfair Ex. 6 and Wayfair Ex. 18.

1, 2018, including all of Wayfair's policies set forth therein.[8]  While it is true a copy of the policies were provided on Wayfair's "knowledge base," yet, Boska was familiar with the polices, however, she did not recall receiving a copy of the Equal Opportunity Policy contained in the Employee Guide.[9] Furthermore, Cory stated that she received a copy of the Wayfair Employee Guide when she was first employed but she did not remember what was in the guide.[10]

**Defendants' SOF No. 8:**  *Plaintiffs acknowledged that they had channels at Wayfair to lodge complaints if they believed they were discriminated against.  Boska Dep. 50:4-11; Cory Dep. 31:13-16.*

**RESPONSE:  Disputed in part.**  The employee handbook produced by Wayfair does not apply to the employment of Boska and Cory as it was revised, edited, modified, altered, and changed as of April 2019, which was after Boska and Cory were terminated from their employment on November 1, 2018, including all of Wayfair's policies set forth therein.[11]

**Defendants' SOF No. 10:**  *During her employment at Wayfair, Wayfair issued a verbal warning, written warning, and a record of discussion to Cory for attendance problems.  Exhibit 25, September 29, 2014 Verbal Warning; Exhibit 26, November 10, 2014 Written Warning; Exhibit 27, August 2015 Record of Discussion; Cory Dep. 51:6-25; Cory Dep. 52:2-9; Cory Dep. 52:11-53:4.*

**RESPONSE: Disputed in part.**  The referenced disciplinary warnings were given to Cory between August 2014 through April 2015, approximately three (3) years prior to Cory's termination.[12] The record cited by Wayfair does not support that claim that Cory received any sort of warning in August 2015. Rather, the record of discussion was issued on April 20, 2015.[13] All of the written warnings pertained to attendance issues.[14]  The records state attendance

---

[8] *Id.*; see also Plaintiffs' Ex. 3, Cory Dep., 43:6-20; Plaintiffs' Ex. 2, Boska Dep., 150:20-24.
[9] Plaintiffs' Ex. 2, Boska Dep., 46:19-23; 47:6-8; 48:15-18.
[10] Plaintiffs' Ex. 3, Cory Dep., 28:25-29:3.
[11] Plaintiffs' Ex. 1 at p. 1; see also Cory Dep., 43:6-20; Ex. 5, Boska Dep., 150:20-24.
[12] Wayfair Ex. 25, 26 and 27.
[13] Wayfair Ex. 25.
[14] Wayfair Exs. 26 and 27.

"[o]ccurences are expunged from employees' records after 12 months from the original date of occurrence," and the policy was later revised to state, "...customer service agents [have] the opportunity to earn back an attendance occurrence for having stellar attendance [for] 2 consecutive months."[15] As such, given that Cory was terminated on November 1, 2018, her attendance record reflected in these notices would have been expunged and all absence discrepancies would have been removed well before any of the events giving rise to her termination on November 1, 2018.[16]

**Defendants' SOF No. 11:** *On December 9, 2016, Wayfair issued a record of discussion to Cory regarding her team being placed on the "Do Not Send Home Early" list in light of attendance/productivity issues on Cory's team. Cory Dep. 53:6-56:20; Exhibit 28, December 9, 2016 Record of Discussion. The "Do Not Send Home Early" list meant Cory's team was not eligible to leave work early for a period of time because of attendance/productivity issues. Id.*

**RESPONSE: Disputed in part.** Cory does not dispute that she received an email regarding this information. Cory disputes that it was received on December 9, 2016, as the record cited by Defendants indicates it was issued October 13, 2016 via email rather than a formal document record.[17] Additionally, the changes to the team were not for Cory but for her team, as she was managing was a "newer team" and "they were just learning the process of being in ready status."[18] Additionally, as stated in Cory's response to Defendants' SOF No. 10, attendance "[o]ccurences are expunged from employees' records after 12 months from the original date of occurrence," and the policy was later revised to state, "...customer service agents [have] the opportunity to earn back an attendance occurrence for having stellar attendance [for] 2 consecutive months."[19] Hence, this had nothing to do with her termination.

**Defendants' SOF No. 12:** *Wayfair issued an additional record of discussion to Cory on April 28, 2017 for failing to turn in required data in relation to a First Call Resolution ("FCR") dive for her team. Specifically, Cory had been expected to provide data related to orders that*

---

[15] Id.
[16] *Id.*; Ex. 2, Cory Dep., 43:6-20.
[17] Wayfair Ex. 28.
[18] Plaintiffs' Exhibit 3, Cory Dep., 53:15-19; 54:24-55:8.
[19] Wayfair Ex. 28 & 29.

*required repeated contacts from customers in order to improve service level and customer experience. Cory Dep. 57:1-59:9; Exhibit 29, April 28, 2017 Record of Discussion ("Not completing these reports is a form of insubordination because the expectation has been set over the past couple of weeks and could result in disciplinary action as necessary.")*

**RESPONSE: Disputed in part.** Cory does not dispute that she received an email regarding this information. However, as above, it was not a formal "Record of Discussion" as before, but an email from Tony Duersch.[20] Cory said she could not recall if there were "specific times" in which the "dive" needed to be done.[21] According to Tony Duersch's email to Cory, the "dive" was to be completed "each week for the next several weeks" after receiving the email from Ms. Kevern."[22] Also, portions of the dive were not functional at the time Cory was contacted by Mr. Duersch.[23] Mr. Duersch was simply reminding Cory of the FCR dive and weekly updates by stating, "…this needs to find some time in your week…"[24] Nonetheless, none of this had anything to do with her termination.

**Defendants' SOF No. 13:** *Cory acknowledged her performance struggles when she rated herself as below expectations in her Summer 2017 Managers Performance review covering the period from January 1, 2017 to June 30, 2017. Cory Dep. 63:5-64:19; Exhibit 31, Cory Summer 2017 Managers Performance Review.*

**RESPONSE: Disputed in part.** Cory does not dispute that she "could have" rated her performance as below expectations.[25] Yet, according to the rating scale listed on the performance evaluation a rating of "3" means "exceeding expectations," a rating of "2" means "meeting expectations for level" and a rating of "1" means "below expectations for level."[26] On the evaluation, Cory gave herself a "3" which as provided by the overall rating scale meant she

---

[20] Wayfair, Ex. 29.
[21] Plaintiff's Ex. 3, Cory Dep., 57:11-13.
[22] See Wayfair Ex. 29.
[23] *Id*.
[24] *Id*.
[25] Plaintiff's Ex. 3, Cory Dep., 63:5-11.
[26] Wayfair Ex. 31, Cory Summer 2017 Managers Performance Review, p. 3.

believed she was "exceeding expectations."[27] Cory also included various comments related to the improvement of her overall performance, thus acknowledging her efforts rather than any "struggles" she may have had.[28] Further, in her Summer 2017 Managers Performance Review, she received a rating of "meets expectations."[29]

**Defendants' SOF No. 14:** *On February 27, 2018, Wayfair placed Cory on a Performance Improvement Plan ("PIP") for performance accountability, coaching compliance, manager engagement, and struggling to meet and exceed team performance on a consistent basis. Cory Dep. 59:11-61:20; Exhibit 30, Cory PIP. The PIP also referenced Cory's Winter 2017 Performance Review ranking of "needs improvement." Ex. 30 at p. 1 ("Winter review for 2017 Angela ranked a Needs Improvement and this performance improvement plan is designed to help set expectations for future growth.").*

**RESPONSE: Disputed in part.** Cory does not dispute that she was placed on a Performance Improvement Plan in February, 2018. However, as reported in her employee record, Cory actually received a rating of "meets expectations" for her 2017 Winter Performance Review.[30] Furthermore, according to her Winter 2017 Performance review both Cory and Tony Duersch, her manager, gave Cory a rating of "meeting expectations for level" in all categories of her performance.[31] Based on the foregoing, the comments made by Ryan Fisher related to Cory's overall performance is inaccurate and the 2017 Winter Performance Review given to Cory reflects that she was meeting expectations on all levels of her overall performance.[32] Also, Ryan Fisher was only Cory's manager for no more than two months.[33] Cory stated that the "content of the performance improvement plan was an everyday discussion with everyone," and yet Cory was the only one given the PIP.[34] Again, this had nothing to do with Cory's termination.

---

[27] *Id*. at p. 3.
[28] *Id*. at p. 4-6.
[29] *Id*. at p. 4.
[30] Wayfair Ex. 31.
[31] Plaintiffs' Ex. 7, p. 3.
[32] *Id*.
[33] Plaintiff's Ex. 3, Cory Dep., 59:18-22.
[34] *Id*. at 60:11-18.

**Defendants' Statement No. 15:**  *Cory received an overall performance rating of "below expectations" in her Winter 2018 Managers Performance review.  Cory Dep. 63:23-64:21; Exhibit 32, Cory Winter 2018 Managers Performance Review (covering the period from July 1, 2017 to December 31, 2017).*

**RESPONSE:  Disputed**.  Like her 2017 Summer Review, the rating scale established that a "1" meant "below expectations/needs improvement," a rating of "2" meant "meeting expectations for level," and a rating of "3" meant "exceeding expectations for level."[35] As rated on her overall performance, her manager rated her with a "3" which should have meant "exceeding expectations for level," however, next to the rating it states, "below expectations for level."[36]  As such it is unclear which overall rating is appropriate.   Ryan Fisher, her manager, provided comments and feedback that were not consistent with a rating of "below expectations," for example Mr. Fisher states, "I want to challenge you to ***continue*** to actively engage with your team, and with your peers to drive the company goals and objectives."[37] Accordingly, it is apparent that Cory was meeting expectations and excelling as a manager, as shown by the ratings from her subordinates, wherein the majority cited that they were "most likely" to "recommend [their] manager."[38] Therefore, Cory's alleged rating is not supported by the information provided in the review.

**Defendants' SOF No. 16:**  *Cory received an overall performance rating of "inconsistent performance" in her Summer 2018 Managers Performance. Exhibit 33, Cory Summer 2018 Managers Performance Review (covering the period from January 1, 2018 to June 30, 2018).*

**RESPONSE:  Disputed in part.**  Cory does not dispute that the Summer 2018 review states she was rated at "inconsistent performance," however, the 2018 Summer Performance review is incomplete and is not signed by Cory and lacks Cory's self-evaluation.[39] Furthermore,

---

[35] Wayfair Ex. 32, p. 3.
[36] *Id*. at p. 4.
[37] *Id*. at p. 5.
[38] *Id*. at p. 19.
[39] Wayfair Ex. 33, Cory Summer 2018 Managers Performance Review.

as claimed by Lani Watson ("Watson"), the manager who completed the review, Cory "did not

report to [her] until the end of the first half of the year."[40] Also, while Watson claims she was

assigned as Cory's manager by Kim Orehoski ("Orehoski"), Orehoski denies Cory reported

directly to her.[41]

**Defendants' SOF No. 18:**  *Wayfair issued a verbal warning corrective action to Boska on September 22, 2016 for failing to consistently communicate with her team, and failing to conduct weekly coaching sessions.  Ex. 3, Boska Dep. 159:9-160:8; Exhibit 34, Boska Verbal Warning ("Kalie is expected to make improvement on the following items during the month of September, failure to do so will result in further disciplinary action up to and including termination.").*

**RESPONSE:  Disputed in part.**  Boska does not dispute that she received an email from

Orehoski.  However, the warnings are inconsistent with her performance reviews. According to

her 2017 Winter Performance Review, the rating system is labeled stating "M" is the rating for

"meeting expectations for level," "E" meant "exceeding expectations for level" and "B" meant

"below expectations/needs improvement."[42] The ratings in the performance review are not

consistent with the rating scale, in fact, both ratings from Boska and Miles Dunn ("Dunn") use a

number system.[43] As such, it is unclear what Boska's overall rating consisted of.  Furthermore, the

overall ratings from her team state Boska consistently or frequently provided support to her team.[44]

Also, the verbal warning was simply related to "one person on [her] team," that complained there

was no communication despite Boska's efforts, which was untrue as Boska "verbally" answered

her questions.[45] Boska also made efforts to communicate with her team more.[46]

**Defendants' SOF No. 19:**  *On or about December 7, 2016, Boska received a letter issued by Miles Dunn outlining her required performance expectations for the next thirty (30) to sixty*

---

[40] *Id.*
[41] Plaintiff's Exhibit 4, Deposition of Lani Watson, 12:9-12; Plaintiff's Exhibit 5, Deposition of Kim Orehoski, 105:7-9.
[42] Wayfair Ex. 39, Boska Winter 2017 Managers Performance Review, pp. 2-3.
[43] *Id.*
[44] *Id.* at pp. 5-13.
[45] Plaintiffs' Exhibit 2, Boska Dep., 159:18-160:2.
[46] *Id.* at 160:2-3.

*(60) days, noting that "[f]ailure to meet the requirements of this plan will result in additional disciplinary action up to and including termination." Ex. 3, Boska Dep. 161:6-163:4; Exhibit 35, Boska Performance Expectations 30 and 60 Days.*

**RESPONSE:  Disputed in part.**  Boska does not dispute that the letter says what it says, however, the purpose of the letter was to set expectations for what she needed to do when she returned back to the office.[47] Dunn testified in his deposition that he was directed by Orehoski to issue discipline to Boska and "manager her out of the organization" and fire her shortly after he became Boska's supervisor, and on the heels of her returning from FMLA leave.[48] Boska testified the purpose of the letter was not a warning but to set expectations upon returning from leave.[49]

**Defendants' SOF No. 20:**  *Boska was placed on a PIP for consistently failing to document and hold her team accountable in a timely fashion.  Specifically, Boska failed to maintain an acceptable level of coaching compliance for the previous six months. Ex. 3, Boska Dep. 164:10-165:7; Exhibit 36, Boska PIP.  The Plan warned that "If all expectations are not met weekly, the result will be termination of employment.  These expectations are indefinite and are a core function of the management position she is in." Ex. 36.*

**RESPONSE:  Disputed in part.** See response to SOF No. 19, which is incorporated herein. Boska does not dispute that she received a PIP. Dunn was directed by Orehoski to paper the record and fire Boska after she returned from FMLA leave, even though Dunn admitted he had no basis to issue a PIP to Boska.[50] Predictably, Boska filed a complaint on January 23, 2017, alleging retaliation for taking approved FMLA after she received the PIP.[51] Boska submitted another complaint to the Human Resources Department, on January 26, 2017.[52] William Quick, Human Resources, received the complaints, investigated the complaints and made a determination that the discipline was "not right," "unfair," and as a result removed the final warning and the

---

[47] *Id.* at 161:15-20.
[48] Plaintiffs' Ex. 6, Dunn Dep., 9:3-10:16.
[49] Plaintiffs' Ex. 2, Boska Dep., 161:15-20.
[50] Plaintiffs' Ex. 6, Dunn Dep., 9:3-10:16.
[51] Plaintiffs' Ex. 8, Boska Complaint Letter.
[52] *Id.* at p. 4.

PIP.[53] Hence, this discipline was removed from Boska's personnel file.

Additionally, prior to receipt of the PIP, Boska missed a significant amount of time because of ongoing medical issues during the period discussed in the PIP. Specifically, Boska worked remotely from April 2016 through October 2016.[54] Boska also took approved FMLA between November 4, 2016, through November 30, 2016, and December 26, 2016, through January 3, 2017.[55] Immediately after returning to work, she was placed on the PIP.[56] Also prior to any disciplinary action, Boska received excellent performance reviews, it was not until Boska went on leave that her "performance reviews went down."[57]

**Defendants' SOF No. 21:**  *On or about August 22, 2018, Boska received a written warning for conduct for "not promoting our team building and culture standards as a Manager by adding to and continuing to engage in the escalated conversation on the calling floor which created an unsafe environment for those involved." Ex. 3, Boska Dep. 167:20-168:6; Exhibit 37, Boska Written Warning.*

**RESPONSE:**   **Disputed in part.**  Boska does not dispute that she received a written warning, however, Boska did not start the fight, rather she attempted to "move it off the floor," and "tried to de-escalate the situation."[58] Also, the warning given to Boska was authored by Brenna Heidrick ("Heidrick"), who was not Boska's direct supervisor.[59] "[G]enerally [Wayfair] would not be holding any formal investigation," in these scenarios.[60] Heidrick stated that Boska was given the "written warning" because she "failed to de-escalate" the argument and "matched kind of the intensity."[61] There is no evidence that Boska violated any policy or did anything wrong in

---

[53] Plaintiffs' Ex. 2, Boska Dep., 107:12-21; 108:11-19; 112:21-25.
[54] Plaintiffs' Exhibit 9, Wayfair Work-At-Home Checklist; Plaintiffs' Exhibit 10, September 22, 2016, Email from Kimberly Orehoski to Boska.
[55] Wayfair Ex. 20, Wayfair Ex. 24, Wayfair Time Off Requests Report.
[56] Plaintiffs' Ex. 2, Boska Dep., 99:17-21.
[57] *Id.* at 181:5-12, Ex. 12.
[58] Plaintiffs' Ex. 2, Boska Dep., 168:8-18.
[59] Plaintiffs' Exhibit 11, Deposition of Brenna Heidrick, 22:10-13.
[60] *Id.* at 19:2-14.
[61] *Id* at 23:5-13.

attempting to deescalate the confrontation between two other workers.

**Defendants' SOF No. 22:**  *On October 11, 2018, Wayfair issued a verbal warning for performance to Boska because her last four performance reviews resulted in unsatisfactory ratings. Ex. 3, Boska Dep. 169:8-170:10; Exhibit 37, Boska Written Warning.*

- *Winter 2017 Managers Performance review – below expectations (Ex. 3, Boska Dep. 171:7-172:9; Exhibit 39).*
- *Summer 2017 Managers Performance review – below expectations (Ex. 3, Boska Dep. 172:10-173:3; Exhibit 40).*
- *Winter 2018 Managers Performance review – below expectations (Ex. 3, Boska Dep. 173:17-174:13; Exhibit 41).*
- *Summer 2018 Managers Performance review – inconsistent performance (Ex. 3, Boska Dep. 175:7-176:5; Exhibit 42).*

**RESPONSE:   Disputed in part.**   Boska does not dispute that she received a verbal warning.  However, as shown in the performance reviews referenced there is inconsistency in the rating scale and the ratings given to Boska.[62] Specifically, the rating scales shown as follows:

Winter 2017 – "M" means meeting expectations; "E" means exceeding expectations for level; and "B" means below expectations/needs improvement.[63]

Summer 2017, Winter 2018, – "1" means below expectations/needs improvement; "2" meeting expectations for level; and "3" exceeding expectations for level.[64]

Throughout the performance reviews, the ratings given by management and Boska are inconsistent with the rating scale provided in the Winter 2017, Summer 2017 and Winter 2018 performance reviews.[65] Accordingly, it is unclear how Boska was rated in her performance reviews.  The Summer 2018 review does not provide a rating scale and Boska had only returned to work two (2) months prior to the review period of 01/01/2018 – 06/30/2018, as stated on the

---

[62] Wayfair Ex. 39, Boska Winter 2017 Managers Performance Review; Wayfair Exhibit 40, Boska Summer 2017 Managers Performance Review; Exhibit 41, Boska Summer 2018 Managers Performance Review, Exhibit 42, Boska Summer 2017 Managers Performance Review.
[63] Wayfair Ex. 39 at p. 2.
[64] Wayfair Ex. 40 at p. 3, Ex. 29 at pp. 2-3.
[65] Wayfair Ex. 39; Ex. 40; Ex. 41. Ex. 42.

performance review.[66] It is also important to note that the performance review given to Boska for the above period was not provided to her until October 2018, approximately four (4) months after the period had ended.[67] Also, the team given to Boska was "only on the floor for a month and a half" and during that time they were expected to be at their "thirty day stats," "sixty day stats," and "ninety date stats."[68]  Because the team was "brand new" they had not yet had the opportunity reached their sixty-day or ninety-day stats.[69]

Boska was not terminated for her performance, and she had achieved the performance. See additional SOF below.

**Defendants' SOF No. 24:**  *Cory testified that no one at Wayfair ever made negative comments about her taking leave nor did she ever hear comments indicating that employees using FMLA should be terminated or retaliated against.*

> *Q.  Did anyone at Wayfair ever make any comments to you negative towards your leave?*
> *A.  No.*
> *Q.  Okay. Did you ever hear anyone at Wayfair indicated that employees who used FMLA should be terminated?*
> *A.  No.*
> *Q.  Did you ever hear any managers or HR individuals at Wayfair indicate that employees the used FMLA leave should be retaliated against?*
> *A.  No.*

*Ex. 2, Cory Depo. 70:4-6; 71:21-72:3.*

**RESPONSE:  Disputed in part.**  Cory attended meetings that were held by HR and management where they would discuss ADA and FMLA claims and as a manager she was aware of comments made about employees' ADA and FMLA leave requests.[70]  Specifically, HR and management would speculate as to whether "employees were using [ADA and FMLA] legally or if they were using it to have accommodations."[71] Michelle Erickson ("Erickson"), Talent Manager,

---

[66] Wayfair Ex. 40.
[67] *Id*.
[68] Plaintiffs' Ex. 2, Boska Dep., 170:11-171:2.
[69] *Id*. at 171:2-4.
[70] Plaintiffs' Ex. 3, Cory Dep., 70:17-71:20.
[71] *Id*. at 71:13-20.

recalls having conversations about employees who were on FMLA leave, with managers, including Orehoski.[72] Orehoski also testified that employees came to her with frustrations about FMLA leave and ADA accommodations.[73] In fact, L4 managers would report to Orehoski about their frustrations.[74] L4 managers included but were not limited to Ron Harper, Heidrick and Watson.[75]

**Defendants' SOF No. 25:** *All employee accommodations requested by Boska were either approved by Wayfair, or she elected to use short term disability in lieu of the accommodation request.* ***Ex. 3****, Boska Dep. 127:1-7.*

**RESPONSE:  Disputed in part.** Boska requested a workplace accommodation in August 2017.[76] However, Boska was not approved for this accommodation immediately, in fact, she was not approved for this accommodation until months after her initial request.[77] See also response to SOF No. 26 below, which is incorporated herein.

**Defendants' SOF No. 26:**  *Specifically, on September 21, 2017, Boska made her first request for an accommodation to work from home, but Boska decided to take short-term disability in lieu of the work from home accommodation. Ex. 3, Boska Dep. 120:16-121:22; Exhibit 20, Boska ADA Requests for Accommodation.*

**RESPONSE:  Disputed in part.** Boska does not dispute that she requested a work from home accommodation, however, Wayfair would not permit her to work at home at the time.[78] Specifically, Watson and Erickson told Boska that "they did [not] want [her] working from home."[79] As such, Boska decided to apply for short-term disability instead.[80] Also, Boska's accommodation was not approved until the very end of October, but by this time she had already

---

[72] Plaintiffs' Exhibit 12, Deposition of Michelle Erickson, 16:12-17:11.
[73] Plaintiffs' Exhibit 5, Orehoski Dep., 36:21-23.
[74] *Id*. at 37:2-13.
[75] *Id.* at 37:14-17.
[76] Wayfair Ex. 20, August 2017 Accommodation Request Form.
[77] Plaintiffs' Ex. 2, Boska Dep., 122:7-18; 123:10-14.
[78] *Id*. at 122:7-10.
[79] *Id*. at 124-24.
[80] *Id*. at 122:7-18; 123:10-14; 124:2-7.

submitted the short-term disability paperwork because her request to work from home had been denied.[81]

**Defendants' SOF No. 28:**  *Boska applied for three FMLA leaves of absence and one intermittent leave of absence during her employment with Wayfair.  The first leave of absence was October 28, 2016 through December 1, 2016, the second leave of absence was December 20, 2016 through January 3, 2017, and the third leave of absence was September 11, 2017 through February 1, 2018 for her own personal medical conditions. Ex. 3, Boska Dep. 67:23-70:6; 71:1-72:16; 75:22-25; 76:12-17; 82:66-83:8; Exhibit 24, Leave of Absence Applications.*

**RESPONSE:  Disputed in part.**  Boska does not dispute taking leaves of absence during her employment for her personal medical conditions.   However, Orehoski and Erickson asked Boska demeaning questions about her leave, including "why [she] was having a procedure done," "what [was she] having done," "why [was she] going to be out so long," and "you've already missed so much time, you are now going to miss more?"[82] Furthermore, when Boska made her first request for an accommodation, she was not approved until months later after submitting short-term disability work.[83]   Also, Boska was discouraged from using her intermittent FMLA leave beginning February 23, 2017 because, rather than permitting her to take FMLA leave, Orehoski told Boska to "go sit in a quiet room or out in [her] car and sleep it off," even after she informed Orehoski that she was feeling sick.[84] Every time Boska took FMLA leave, she was "shunned from managers, team managers" and "[n]o one wanted to do anything . . . when [she] came back from short-term disability."[85]

**Defendants' SOF No. 29:**  *Wayfair approved all of Boska's requests for FMLA leaves of absence, and intermittent leaves of absences, and Boska testified that Wayfair did not interfere with her FMLA requests.  Ex. 3, Boska Dep. 83:14-25.*

**RESPONSE:  Disputed in part.** See responses to SOF Nos. 26-28, which are incorporated

---

[81] *Id*. at 123:10-14.
[82] *Id*. at 72:19-73:3.
[83] *Id*. at 123:10-14.
[84] *Id*. at 77:7-12; 80:2-7, 14-20.
[85] *Id*. at 85:3-9.

herein. Boska does not dispute that Wayfair approved her requests. However, Wayfair frequently discouraged her and shamed her for requesting and taking leave. Orehoski and Erickson "talked down to [her]," "demeaned [her]," and told her that if she were to turn her leave request into Erickson, things would "get worse."[86] Also approximately one (1) week after returning from FMLA she was removed from her prior shift.[87] Furthermore, instead of permitting her to take her approved leave, Orehoski would tell Boska to "go sit in a quiet room or out in [her] car and sleep [her flare-up] off."[88] In fact, before she was permitted to go home and/or instead of going home, Orehoski would tell Boska to "go take a nap in [her] car or in the mother's room/quiet room, sick room."[89]

**Defendants' SOF No. 31:**   *On January 31, 2017, Wayfair immediately conducted an internal investigation with Talent Operations HE Manager William Quick, a neutral party based in Texas.  Quick interviewed Boska, Kimberly Orehoski, and Miles Dunn.  Ex. 3, Boska Dep. 107:12-19; 108:11-25.  The investigator concluded that Boska's allegations were unfounded. Exhibit 15, Deposition of Kimberly Orehoski ("Orehoski Dep."), 63:17-24.*

**RESPONSE:  Disputed in part.**  Boska does not dispute that Wayfair conducted an internal investigation. However, William Quick found that Orehoski and Dunn's actions were "unwarranted and it was [not] fair."[90] Because of this fact, Quick made Orehoski and Dunn remove Boska's final warning.[91] Quick also investigated Boska's second complaint, and "determined that it was not right, it was unfair, and removed her final [warning]."[92] In fact, Boska was given her shift back and the PIP was removed following her complaint.[93] In addition, after the investigation by Quick determined the PIP was retaliatory, Dunn, Boska's manager who issued the PIP to her,

---

[86] *Id*. at 72:19-25; 75:18-21; 76:10-11.
[87] *Id*. at 77:22-78:1.
[88] *Id*. at 79:17-80:7.
[89] *Id*. at 81:11-13.
[90] *Id*. at 107:14-19.
[91] *Id*. at 107:20-24.
[92] *Id*. at 108:11-19.
[93] *Id*.

was disciplined by Wayfair.[94] Dunn admitted that it was Orehoski who told him to place Boska on

the PIP, that Orehoski told him to fire Boska and manager out of the organization, and that he had

not worked at Wayfair long enough to know whether Boska needed to be on the PIP.[95]

**Defendants' SOF No. 33:**  *Wayfair provided Plaintiffs with guidelines on how to conduct interviews and Cory testified that Wayfair trained her to not ask questions about age, religion, politics, race, and medical conditions.  Ex. 3, Boska Dep. 137:2-140:8; Ex. 2, Cory Dep. 27:6-28:24.  Boska admitted she was aware that she could not discriminate against a candidate based on age or medical condition.  Ex. 3, Boska Dep. 137:2-140:8.*

**RESPONSE:  Disputed.**  Boldman, who Wayfair complains investigated the interviews

conducted by Boska and Cory, testified that he was not able to find any training given to Bosk or

Cory, and that the only information he allegedly obtained was from Orehoski, who represented to

him that they had received training, but provided not substantiation to him for such claim."[96]

Boldman found no evidence of training at all.[97] Orehoski was involved in the decision to

termination Boska and Cory.[98] In truth, Boska and Cory only received information on "new

processes" that were "being put into place," did not receive training, and were only given

"guidelines" on how to conduct employment interviews.[99] Also when conducting interviews,

Boska and Cory were supposed to "note what [the interviewee] said."[100] See response to SOF No.

34 – 36 below which are incorporated herein.

**Defendants' SOF No. 34:**  *Wayfair received confidential feedback from a candidate who felt he had been discriminated against based on his age:*

> *I received that call a day [after my interview] and was told I didn't have enough experience for the job.  So, I went through all the steps and it seemed like I passed all of those except for the live interview, in which one of the hiring managers, a lot younger*

---

[94] Plaintiffs' Exhibit 6, Dunn Dep. 7:3-21.
[95] *Id*. at 9:10-10:10, 12:2-21.
[96] Plaintiffs' Ex. 13, Boldman Dep. 16:3-19:2.
[97] *Id.*
[98] *Id.* at 14:24-15:12.
[99] Plaintiffs' Ex. 2, Boska Dep., 136:20-137:7; Plaintiffs' Ex. 3, Cory Dep., 27:6-8.
[100] Pls. Ex. 2, Boska Dep., 140:2-4.

> *than I, read her questions from a computer, and the other hiring manager wrote down by answers to those questions on another computer.  It seems to me my being turned down for the position had nothing to do with the experience, since I had 25 years of experience, but was based on my age.  Of course, the hiring managers or AJ couldn't tell me that because it is against the law to discriminate based on age; so they used experience as the reason.  I am not going to roll over on this but will pursue other remedies.*

*Ex. 10, Feedback Survey (emphasis added); Ex. 15, Orehoski Dep. 87:4-90:18.*

**RESPONSE:  Disputed in part.**  Boska and Cory do not dispute that they conducted an interview, and the candidate complained later of age discrimination in a survey, but dispute that they did anything wrong during the interview. Boldman, who claimed he investigated the issue, was unaware of any evidence the candidate provided to support his claim of age discrimination.[101] There is no evidence Wayfair found his complaint meritorious.  In fact, in response to the candidate's allegations, Boldman noted that the candidate did not "specifically recall that [he was] asked about [his] age.[102] And he did not see the interview notes after their interview.[103]  Also, during the interview, Boska and Cory recall that the candidate made negative comments about Mexicans and younger individuals.[104] Specifically, the candidate told a story about not hiring a Mexican, and later finding out that he murdered someone and put them in his basement, and that he made comments about being "smarter than the younger generation," "he knew more," "he may not know computers very well, but he is smarter in every other way than the younger generation."[105] Cory reflected these same comments in the interview guide, and even noted that "he tends not to use [p]olitically correct wording."[106]

---

[101] Plaintiffs' Ex. 13, Boldman Dep. at 23:25 -24:17.
[102] Plaintiffs' Ex. 14, Fred Boldman Email.
[103] Plaintiffs' Ex. 13, Fred Boldman Dep., 45:4-14.
[104] Plaintiffs' Ex. 2, Boska Dep., 144:8-147:7; Plaintiffs' Ex. 3, Cory Dep., 40:20-41:17.
[105] *Id.*
[106] Wayfair Ex. 13, Interview Notes August 6, 2018; Wayfair Ex. 14, Interview Notes.

**Defendants SOF No. 35:**  *Upon review of this feedback, Tammy Schade (Recruiting Manager) emailed Fred Boldman (Human Resources Manager) on October 18, 2018, stating that the candidate (who had identified himself by name in the complaint) "fel[t] as if he was discriminated against based on age" and asked what Wayfair should do with the information.  Ex. 10, Feedback Survey; Ex. 11, Boldman Dep. 20:3-8; 18-12; Exhibit 12, Fred Boldman Conversation Summary.*

**RESPONSE:  Disputed.**  Boska and Cory dispute that the candidate made a complaint, rather the candidate responded to a requested survey from Wayfair.  The interview occurred on August 6, 2018, approximately two months prior to Wayfair responding to the candidate's survey.[107]  Boldman also states that he was unaware of the content of the email was "verbatim the information that the candidate provided."[108]

**Defendants' SOF No. 36:**  *On October 11, 2018, Boldman and Megan Cundick (Sr. Associate, Talent Acquisition) contacted the candidate regarding his survey feedback and interview experience, and the candidate reiterated that he felt that he was discriminated against based on his age because of the outcome of the interview.  Ex. 11, Boldman Dep. 37:16-39:12; Exhibit 12.  The candidate could not specifically recall if he was asked about his age.*

**RESPONSE: Disputed in part.**  Boska and Cory do not dispute that Boldman and Megan Cundick contacted the candidate.  However, during the conversation, the candidate may have alleged he was discriminated against because of his age, yet, he did not provide any feedback or evidence supporting this fact.  In fact, the only facts claimed in his complaint were, "one of the hiring managers, a lot younger, read her questions from a computer, and the other hiring manger wrote down my answers to those questions on another computer," and "[i]t seems to me being turned down for the position had nothing to do with experience…but was based on my age."[109]  Also, when asked he could not confirm if he was asked his "birthdate" or whether he was "asked about [his] age."[110]

**Defendants' SOF No. 38:**  *During its investigation of this Complaint, Wayfair discovered*

---

[107] Plaintiffs' Ex. 15, Tammy Schade Email; Boldman Dep., 21:11-15; see also Wayfair Exs. 13 and 14.
[108] Plaintiffs' Ex. 13, Boldman Dep., 21:23-22:1.
[109] Plaintiffs' Ex. 15.
[110] Plaintiffs' Ex. 14.

*that Cory and Boska conducted this interview and notated on the interview form under "Hiring Decision: Additional Notes" the following:*

> *Very Arrogant*
> *Admitted he's not good with technology*
> *He tends to not use Politically Correct wording.*
> *Doesn't seem to be a team player although he says he is.*
> *Couldn't answer our questions even after probing*
> *He didn't listen to the questions very well*
> *He is discriminatory [sic] age.*

*Exhibit 13, Interview Notes (emphasis added); Ex. 2, Cory Dep. 42:2-43:4.  The box "No" was checked for "Hiring Decision: Additional Notes."  Ex. 12, Interview Notes.*

**RESPONSE:  Disputed in part.**  Boska and Cory do not dispute conducting the interview and filling out the interview form.  However, plainly neither Cory nor Boska violated any policy of Wayfair, violated any training given to them, or did anything wrong but instead accurately reflected the content of the interview. During the interview the applicant discussed hiring a "Mexican man," who quit, and he later found out he murdered a man and buried him in basement, and that he "will never hire another Mexican man again."[111] Accordingly, both Boska and Cory felt that "referring to his employee as 'The Mexican' was problematic for Wayfair."[112] Also, Cory made a typo when placing her notes on the form, specifically she stated the form should have said," discriminatory against age."[113]  In addition to the foregoing, the applicant was "discriminatory against the younger generation," he continuously used the words "[t]he younger generation," throughout the interview.[114]  Cory placed notes to support her testimony on the interview form, wherein she states, "[he] proceeded to tell us a story about a man and how he murdered someone and is currently in jail," and, "[h]e tends to not use Politically correct wording."[115]

---

[111] Plaintiffs' Ex. 2, Boska Dep., 144:23-145:6.
[112] Plaintiffs' Ex. 3, Cory Dep., 41:6-8.
[113] *Id.* at 42:7-10.
[114] *Id.* at 42:10-15.
[115] Plaintiffs' Ex. 15.

Boldman did not interview or obtain statements from Boska or Cory as part of his investigation.[116] Boldman never asked Boska or Cory about what training they had received as part of his investigation.[117] Boldman didn't even know the age of the candidate following his investigation, or whether he was under 40.[118] The candidate could not confirm whether he was asked his birth date.[119] The candidate reinterviewed with Wayfair and was not hired.[120] Boldman created notes ten days after Boska and Cory were terminated.[121]

**Defendants' SOF No. 39:**  *Upon further investigation, Boldman discovered Plaintiffs conducted another interview on August 1, 2018 of a separate applicant with two notes regarding the candidate's medical condition.  First, under the "Reliable & Accountable" Section there was a note "Have missed days due to medical issues." Second, under the "Hiring Decision: Additional Notes" Section there was a note "Mentioned some medical problems that have prevented her from coming to work or leave work early." Ex. 11, Boldman Dep. 42:15-25; Exhibit 14, Interview Notes.*

**RESPONSE: Disputed in part.**  Boska and Cory do not dispute that Boldman interviewed a separate candidate.  The candidate was hired by Wayfair.[122] Boska and Cory were told to put themselves into the interview forms and "how [they] feel about [comments]."[123] Also, specifically, during the interview the applicant made comments about "never [being] late, but she did have a few medical issues," however, "she [was] good to go and there should [not] be any issues in the future."[124]  Regardless of the comments, Boska and Cory did not bring up anything about her medical issues and she brought up the medical issues on her own.[125] Additionally, this applicant was later hired for the position.[126]

---

[116] Plaintiffs' Ex. 13, Boldman Dep. 24:23-25:13.
[117] *Id.* at 25:14-26:6.
[118] *Id.* at 35:3-18.
[119] *Id.* at 38:1-14.
[120] *Id.* at 39:13:16.
[121] *Id.* at 41:5-9.
[122] Plaintiffs' Ex. 13, Boldman Dep. 31:21-23.
[123] Plaintiffs' Ex. 2, Boska Dep., 149:5-8.
[124] *Id*. at 141:5-14.
[125] *Id.* at 141:14-18; Plaintiffs' Ex. 3, Cory Dep., 38:8-10.
[126] Plaintiffs Ex. 13, Boldman Dep. 31:10-23.

**Defendants' SOF No. 40:**  *According to Wayfair policies, interviewers cannot ask about age and/or medical issues during the interviews.  If candidates referenced their age and/or medical issues, interviewers should not document that information on the interview form.  Ex. 11, Boldman Dep. 17:4-15; 46:22-47:8).  If candidates voluntarily referenced medical conditions, interviewers are supposed to refer them to Human Resources and not continue to discuss medical issues with the interviewers.  Ex. 2, Cory Dep. 28:13-24.*

**RESPONSE:  Disputed.**  There are no policies that support Mr. Boldman's testimony, accordingly this fact is unsupported. Further, neither Boska nor Cory asked about age or medical issues during the interviews. See response to SOF Nos. 32-39 above, which are incorporated herein. Boldman tried to claim that Boska and Cory were terminated not because they asked about medical issues, but because "it was documented and [the candidate] said it."[127]Wayfair did not provide training and only discussed conducting interviews when "new processes" were put into place.[128]  Additionally, Boska and Cory were only provided with "guidelines."[129]  Furthermore, if a candidate voluntarily brought up a medical condition, Boska and Cory would allow them to speak about their situation.[130]  Also, upon review of Wayfair's documents, Boldman could not find any documents that outline actual training that Boska or Cory received.[131]  Accordingly, Boska states that she was not made aware of what may be considered discriminatory practices in the interview process or the proper and improper notes to be written on the interviews.[132]  Cory recalled that Wayfair had not provided her with any reason as to why the comments written were inappropriate.[133]  Boldman also admits that he could not find any records of training related to the policies cited in Boska or Cory's termination, nor training on candidate interviews.[134]

**Defendants' SOF No. 41:**  *Based on this investigation, which revealed two interviews*

---

[127] Plaintiffs' Ex. 13, Boldman Dep. 43:13-25.
[128] Pls. Ex. 2, Boska Dep., 137:2-7.
[129] Pls. Ex. 3, Cory Dep., 27:6-10.
[130] *Id*. at 28:18-24.
[131] Plaintiffs' Ex. 13, Boldman Dep., 16:3-19.
[132] Plaintiffs' Ex. 2, Boska Dep., 139:12-15; 140:2-4.
[133] Plaintiffs' Ex. 3, Cory Dep., 39:15-24.
[134] Plaintiffs' Ex. 13, Boldman Dep., 53:23:54-8; 54:16-20.

*conducted by Plaintiffs that included impermissible comments, on October 26, 2018, Wayfair made the preliminary decision to terminate Plaintiffs' employment on the basis that they broke Wayfair's Code of Conduct by including potentially discriminating notes in the interview notes.  Ex. 11, Boldman Dep. 45:4-14.*

**RESPONSE:  Disputed in part.**  There is no support for the claim that Boska or Cory broke the Code of Conduct, or any policy of Wayfair, and this SOF provides no such support. Boska and Cory do not dispute the actions taken against them.  Boska and Cory refer to their response to Defendants' SOF No. 40, which is incorporated herein.  Additionally, Boska and Cory were never even interviewed as a part of any investigation conducted into their alleged policy violations.[135]  No statement was obtained from Cory or Boska regarding the interviews or the training they may or may have not received about the fact that anything they had done in the interview notes was a violation of policy.[136]

**Defendants' SOF No. 42:** *Specifically, Plaintiffs' behavior qualified as misconduct under Wayfair Code of Conduct, which defines such violations as "[a]ctions detrimental to the best interest of Wayfair.  Such actions include any action which impairs the public reputation of the organization of individual staff members or any action which impairs successful operation of Wayfair." Ex. 11, Boldman Dep. 52:17-22; Exhibit 16, Wayfair Code of Conduct.  The Wayfair Code of Conduct also instructs violations may result in appropriate disciplinary action, up to and including immediate discharge.  Id.*

**RESPONSE:  Disputed.**  There is no factual support for the claim that Boska or Cory's behavior violated the Code of Conduct. Mr. Boldman's cited deposition simply states that the termination references the Code of Conduct, not how Plaintiffs purportedly violated the Code of Conduct. Boldman testified he could not locate any training Boska or Cory received or were provided on conducting interviews, but claimed that information on purported training was provided by Orehoski.[137]  Orehoski represented that she had provided the training, which was

---

[135] *Id*. at 24:23-25:5
[136] *Id*. at 25:6-19.
[137] Plaintiffs' Ex. 13, Boldman Dep. at 16:3-24.

false, and provided no substantiation to Boldman of such claim.[138] Orehoski claimed that Boska

and Cory had been trained not to include any information about protected classes in interviews or

ask about protected classes.[139] The employee handbook produced by Wayfair does not apply to

the employment of Boska and Cory as it was revised, edited, modified, altered, and changed as of

April 2019, which was after Boska and Cory were terminated from their employment on November

1, 2018, including the Code of Conduct set forth therein.[140]   Plaintiffs also refer to their response

to SOF No. 40, which is incorporated herein.

**Defendants' SOF No. 43:**  *Wayfair terminated Plaintiffs' employment on November 1,
2018.  Ex. 3, Boska Dep. 150:20-24; Ex. 2, Cory Dep. 43:13-20; Exhibit 17, Cory Termination
Report; Exhibit 19, Boska Termination Report.  Wayfair told Cory and Boska that the reason for
the termination was because of their interview notes of candidates. Ex. 3, Boska Depo. 151:18-
152:2; Ex. 2, Cory Depo. 44:3-17 ("I asked what the reasons were, and then they said because I
had put – I had discussed medical issues with a potential employee… [and] that I had
discriminated against someone due to their age.").*

**RESPONSE:  Disputed in part.**  Plaintiffs do not dispute that they were terminated on

November 1, 2018 or the reasons they were given for their termination.  Plaintiffs refer to their

responses to Defendants' SOF Nos. 33-43, which are incorporated herein, as well as the additional

statement of facts below.

**Defendants' SOF No. 44:**  *Plaintiffs' Termination Reports stated that "upon further
review, previous occurrences of these unprofessional and inappropriate behavior were confirmed,
specifically within interview form documentation." Ex. 17, Cory Termination Report; Ex. 19,
Boska Termination Report.*

**RESPONSE:  Disputed in part.**  Plaintiffs do not dispute that the Termination Reports

say what they say, however, neither Boska nor Cory were provided the opportunity to dispute the

findings and were not aware of any appeal process to their termination and not provided with a

---

[138] *Id.* at 16:25-17:23.
[139] *Id.* at 18:16-19:2.
[140] Ex. 1 at p. 1; Cory Dep., 43:6-20; Boska Dep., 150:20-24.

chance to rebut the termination.[141]   Cory also testified she was not even told about "what code of conduct [she] had violated."[142]   Boska testified that "[n]othing was ever discussed about what could actually go in the notes and what could not go in the notes."[143]   Boska also objected to the fact that she had not been trained properly and no one ever followed up on the complaints she made about not being trained.[144]   Additionally, Cory was never informed as to why the notes written on the forms were "inappropriate."[145] See also responses to SOF Nos. 33-43, which are incorporated herein, as well as the additional statement of facts below.

**Defendants' SOF No. 46:**  *Cory admitted that she had no evidence to support her belief her termination was based on prior FMLA use, rather than Plaintiffs' inappropriate commentary on candidate interview notes:*

> *Q: Can you tell me what forms the basis – what facts form the basis of your opinion that you were retaliated against:*
> *A:  Just the way that I was terminated from my job.*
> *Q:  Is there anything else?*
> *A: No.*

*Ex. 2, Cory Depo. 69:1-17.*

**RESPONSE:  Disputed.**  Cory stated she "believe[d] that the information that was used in those interviews was used to terminated [her], with no actual backbone to them."[146] She also, "fel[t] that they were just looking for something to just terminate [her]."[147] Cory states that she believed she was retaliated against for having used FMLA leave.[148]  Cory believes this because, there were no discussions to see Cory or Boska's side of the story about the interviews and instead

---

141 Plaintiffs' Ex. 2, Boska Dep., 152:10-153:1; Pls. Ex. 13, Boldman Dep., 24:23-25:5.
142 Plaintiffs' Ex. 3, Cory Dep., 49:6-11.
143 Plaintiffs' Ex. 2, Boska Dep., 151:18-152:2.
144 *Id.* at 152:3-9.
145 Plaintiffs' Ex. 3, Cory Dep., 39:15-24.
146 *Id.* at 69:8-13.
147 *Id.*
148 *Id.* at 68:23-25.

Wayfair just took the word of the candidate.[149]  There is no support for the claim that Plaintiffs' interview notes violated any policy, put Wayfair at risk of harm or otherwise damages the reputation of Wayfair.  See responses SOF Nos. 33-43, which are incorporated herein, as well as the additional statement of facts below.

<u>**PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS THAT SUPPORT DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

**I.     BOSKA**

A.     *Boska's Disabilities and Requests for FMLA*

1.      On October 28, 2016, Boska was diagnosed with Pancreatitis.[150]

2.      Boska applied and was approved for FMLA leave from October 28, 2016 to December 1, 2016 to cope with the symptoms of her diagnosis.[151]

3.      Following her diagnosis, Boska requested FMLA in order to undergo a scope procedure.[152]

4.      Boska was approved FMLA to undergo the scope procedure from December 20, 2016 through January 3, 2017.[153]

5.      On February 23, 2017, Boska requested intermittent FMLA in order to cope with the symptoms of her pancreatitis, and Wayfair approved her request.[154]

6.      On August 12, 2017, Boska went to the Emergency Room.[155]

7.      During her visit to the Emergency Room, it was discovered that she had a large radiodense mass of the anterior mediastinum, including thymoma, large mediastinal cyst,

---

[149] *Id*. at 69:20-70:3.
[150] Plaintiffs' Ex. 16, Boska October 2016 FMLA Application.
[151] *Id*.
[152] Plaintiffs' Ex. 17, Boska Second FMLA Application.
[153] *Id*.
[154] Plaintiffs' Ex.18, Boska Intermittent FMLA Application.
[155] Plaintiffs' Ex.19.

lymphoma.[156]

8.      On August 31, 2017, after undergoing tests and a biopsy it was confirmed that Boska had Hodgkin's lymphoma.[157]

9.      Boska then requested a workplace accommodation because of her increased risk of infection and decreased ability for blood clotting, associated with her cancer treatments. Specifically, Boska requested the ability to work from home on a continuous basis while undergoing the treatments from August 2017 through May 1, 2018.[158]

B.      *Boska's qualifications for her position at Wayfair*

10.     Boska was recruited to work for Wayfair by Orehoski, who previously worked with Boska at MarketStar.[159]

11.     Orehoski believed that Boska was a "good employee."[160]

12.     Boska was also a team manager at MarketStar and had customer service experience.[161]

13.     Boska was hired as an Email Supervisor for Wayfair on October 19, 2015.[162]

14.     On February 29, 2016, Boska's title was changed from Email Supervisor to Manager I.[163]

15.     Wayfair also did not dispute that Boska was qualified for her position.[164]

---

[156] *Id*.

[157] Plaintiffs' Ex. 20, Boska Cancer Diagnosis.

[158] Plaintiffs' Ex. 21, Boska Work From Home Request

[159] Pls. Ex. 2, Boska Dep., 36:16-25; Pls. Ex. 5, Orehoski Dep., 16:9-13.

[160] Pls. Ex. 2, Boska Dep., 37:6-13.

[161] *Id*. at 37:23-38:7.

[162] Wayfair Ex. 9, Boska Offer Letter.

[163] Id.

[164] *Id* at p. 6 ¶ 3 (wherein Wayfair states they "will not dispute whether Ms. Boska has an ADA-covered disability or any of the other elements of her prima facie case...").

C.     *Adverse actions taken against Boska after exercising her right to FMLA leave*

16.     Boska exercised her right to taking FMLA leave on three (3) separate occasions during her employment.[165]

17.     After returning from her FMLA leave, Boska was treated differently.[166]

18.     Specifically, Boska was not given awards that other managers were presented with, such as concert tickets, was ignored by other managers, she was kicked off her floor and moved under new management.[167]

19.     After taking FMLA leave from October 28, 2016 through November 30, 2016, Boska returned to the office on December 8, 2016, and immediately received a list of expectations for the next thirty and sixty days from Dunn.[168]

20.     Boska then requested FMLA leave from December 20, 2017 through January 3, 2017.[169]

21.     In response to her request for leave, Dunn told Boska that, "she should only be taking time off when she is physically incapable of working, and that any time off using FMLA should not be used for vacationing or activities…"[170]  Dunn further stated that Boska taking this time off, "conveniently line[d] up with the holidays."[171]  Despite Dunn's negative response, Boska was approved for FMLA and later returned to work on January 3, 2017.[172]

22.     Three days after returning for leave, on January 6, 2017, Boska received a PIP

---

[165] Pls. Ex. 2, Boska Dep., 66:25-67:7.
[166] *Id*. at 87:2-11.
[167] *Id*. at 87:2-88:24.
[168] *Id*. at 161:15-20; Plaintiffs' Ex. 22, Email from Miles Dunn re List of Expectations.
[169] Plaintiffs' Ex. 17.
[170] Plaintiffs' Ex. 28
[171] *Id*.
[172] Wayfair Ex. 39.

from Orehoski and Dunn.[173]

23.     Orehoski and Dunn also changed Boska's shift.[174]

24.     The terms within the PIP were goals that could not have been met within thirty (30) days after receipt of the PIP.[175]

25.     Boska was later diagnosed with cancer on August 31, 2017.[176]  Because of the chemotherapy she was receiving, Boska took leave from August 2017 up to May 1, 2018.[177]

26.     After returning from leave, Boska was moved to different area, reassigned a new team, ignored by managers, and demeaned by her supervisors, including Orehoski.[178]

27.     On or about August 22, 2018, Boska received an unwarranted written warning for misconduct after attempting to diffuse an argument between two managers, rather than holding the managers accountable, Boska was given a written warning.[179]  Specifically, Boska attempted to move the individuals off the floor, so they were not distracting other people.[180]

28.     Watson also gave Boska an unfavorable performance evaluation claiming that Boska had "inconsistent performance."[181]

29.     The rating that was given to Boska was not accurate because she had just received a new team two (2) months before she received her review and given this fact, her team had only been on the floor for a month and a half, therefore, her team had been barely reaching their sixty days stats and should not have been rated on their ninety-day stats.[182]

---

[173] Wayfair Ex. 25.
[174] Plaintiffs' Ex. 2, Boska Dep., 165:8-19.
[175] *Id*. at 106:2-16.
[176] Plaintiffs' Ex. 20.
[177] Plaintiffs Ex. 17; 18.
[178] Plaintiffs' Ex. 2, Boska Dep., 127:11-128:14.
[179] Wayfair Ex. 37, Boska August 2018 Written Warning.
[180] Pls. Ex. 2, 158:12-19; Pls, Ex. 11, Heidrick Dep., 19:2-14.
[181] Wayfair Ex. 42.
[182] Pls. Ex. 2, Boska Dep., 170:16-171:6.

30.     Due to the wrongful rating on her performance evaluation, Boska later received a verbal warning, which stated that there would be a review of her performance on November 6, 2018 to determine if she is unsuccessful in carrying out the actions detailed in the written warning, and that a Development Plan will be issued.[183]

31.     In retaliation for exercising her right to FMLA leave, Boska was terminated from her position on November 1, 2018.[184]

D.     *Boska's complaints of discrimination and retaliation*

32.     On January 23, 2017, Boska submitted a complaint to William Quick, Human Resources, regarding the PIP issued to her.[185]

33.     Specifically, Boska complained stating, "I am submitting this complaint to HR because of the recent actions taken against me due to my health condition and FMLA leave."[186]

34.     Before taking FMLA leave, Boska was never disciplined about her performance.[187]

35.     Boska further stated that she had "requested to have an accommodation, intermittent leave, or to work from home due to the extreme pain [she] was in." However, she was told, "no, and that [she] could go lay in [her] car or the health room to rest on breaks and lunch."[188]

36.     Boska continued to state, "I am in fear for no reason other than my own health and that I am being punished by management because I needed FMLA leave," "I am being harassed, subject to write-ups, shunned and now lost my team and my shift because of my

---

[183] Wayfair Ex. 38, Boska Verbal Warning October 2018.
[184] Plaintiffs' Ex. 2, Boska Dep., 114:2-115:5.
[185] Plaintiffs' Ex. 23, Boska Complaint.
[186] *Id*.
[187] *Id*.
[188] *Id*.

medical condition."[189]

37.     Boska filed a separate complaint on January 26, 2017.[190]

38.     In her complaint Boska, stated that, "[e]xcept for my FMLA-approved absences, I have performed all work in a timely manner and in accordance with Wayfair's expectations of me," and that "…my compliance levels are at the same level or exceed the level of my peers, when not considering my FMLA approved absences."[191]

39.     Subsequently, William Quick, Human Resources Manager opened an investigation into Boska's allegations of retaliation for taking FMLA.[192]

40.     In response it was found that Orehoski and Dunn had acted in error and the final warning and PIP were removed, Boska was given her schedule back, and no longer had to work on Saturdays.[193]

     E.     *Boska's denial of accommodation*

41.     On April 18, 2016, Boska requested and was approved to work from home.[194]

42.     On September 29, 2016, Boska was informed by Orehoski that she was not able to work from home "until further notice."[195]

43.     On September 21, 2017, Boska requested an accommodation to work from home because of her cancer diagnosis.[196]

44.     On September 25, 2017, Boska's medical provider, Deborah Stephens also submitted a request for accommodation form for Boska to be permitted to work from home, "due

---

[189] *Id*.
[190] *Id*. at p. 4.
[191] *Id*.
[192] Plaintiffs' Ex. 24, William Quick Investigation Report.
[193] Pls. Ex. 2, Boska Dep., 107:12-19.
[194] Plaintiffs' Ex. 9.
[195] Plaintiffs' Ex. 25.
[196] Plaintiffs' Ex. 26.

to high risk of infection being around multiple people," and that Boska could, "perform job duties from home, but not at the facility she works at," given Boska was high risk for infection, "throughout [her] chemo regimen."[197]

45.  Boska's intention was to work from home so that she could "perform [her] job duties."[198]

46.  In response, Wayfair questioned why she wanted to work from home, because she was not permitted to do so.[199] Wayfair also expressed that they did not "really want [her to work] from home."[200].

47.  Because there was delay with receiving approval to work at home, Boska made the decision to apply for short-term disability leave.[201]

48.  Boska's accommodation did not get approved until the end of October, however at that point she had already submitted documents to take short-term disability leave.[202]

F.   *Wayfair's denial permitting Boska to exercise her FMLA leave*

49.  On February 23, 2017, Boska was approved for intermittent FMLA leave.[203]

50.  While Boska was not "directly" told she could not exercise her FMLA leave, she was told to, "go sit in a quiet room or out in [her] car and sleep it off" by Orehoski.[204]

51.  Boska informed Orehoski that she planned to take FMLA if she needed it when she was feeling sick.[205]

---

[197] Plaintiffs' Ex. 27 at p. 3.
[198] Pls. Ex. 2, Boska Dep., 121:8-18.
[199] *Id*. at 122:5-9.
[200] *Id*. at 122:9-10.
[201] *Id*. at 122:7-18.
[202] *Id*. at 122:7-18; 123:10-14.
[203] Wayfair Ex. 24.
[204] Pls. Ex. 2, Boska Dep., 79:21-80:7.
[205] *Id*. at 80:14-20.

52.    Boska was repeatedly told that, "rather than going home," she needed to, "go take a nap in [her] car or in the mother's room/quiet room, sick room, before leaving."[206]

## II.    CORY

### A.    *Cory's disabilities and requests for FMLA*

53.    Cory applied and was approved for FMLA on May 15, 2017 in order to undergo Gallbladder Removal Surgery.  Cory was on FMLA from May 16, 2017 through May 22, 2017.[207]

54.    Subsequently, Cory applied and was approved for FMLA to undergo major surgery from September 4, 2018 through October 16, 2018.[208]

### B.    *Adverse actions taken against Cory after taking FMLA leave*

55.    On February 27, 2018, Cory was given a Performance Improvement Plan ("PIP"), which falsely alleged that she had received low ratings on her performance, when in fact her overall performance was rated as "Meets Expectations" for her Summer 2017 Review and a "Meets Expectations for her Winter 2017 Review.[209]

56.    Cory recalls the supervisor who placed her on a PIP was Ryan Fisher, who was only her manager for brief period of time.[210]

57.    On October 17, 2018, Cory returned from FMLA leave.[211]

58.    Following her return from leave, Cory was subjected to an investigation into interviews she had conducted with Kalie Boska approximately three (3) months prior.[212]

59.    Cory was later terminated on November 1, 2018, approximately fifteen (15) days

---

[206] *Id*. at 81:6-13.
[207] Wayfair Ex. 23, Plaintiffs' Ex. 3, Cory Dep., 66:2-9.
[208] Wayfair Ex. 23, Cory 2018 FMLA Application.
[209] Wayfair Ex. 30, Cory PIP; *See* Ex. 11, Ex. 13.
[210] Pls. Ex. 3, Cory Dep., 59:18-22.
[211] Wayfair Ex. 23
[212] Pls. Ex. 3, Cory Dep., 40:14-22.

after her return from FMLA leave.[213]

### III. BOSKA AND CORY'S TERMINATION, LOSS OF BENEFITS AND EMOTIONAL DISTRESS.

A.    *Wayfair's failure of training Boska and Cory.*

60.    After being hired, Boska and Cory received training that every other employee of Wayfair receives after they are first hired.[214]

61.    Boska and Cory received a two-week training that was similar to an orientation.[215]

62.    Boska did not receive interview training when she was hired.[216]  Cory also recalls not being trained on "exactly detail for detail."[217]

63.    As service managers, Boska and Cory performed interviews and recommended candidates for hire.[218]

64.    Regardless of their positions and the requirement to interview potential employees, Boska never received training on company interview practices and Cory recalls only being given "guidelines."[219]

65.    The information that Boska received was simply a review of new processes being put into place regarding a new form and questions Wayfair wanted her to ask during interviews.[220]

66.    Boska was also never made aware of what may be considered discriminatory practices during the interview process, including what proper and improper notes on interviews were.[221]  Cory further states that they were only told "not to discuss medical issues because they

---

[213] Wayfair Ex. 17.
[214] Pls. Ex. 2, Boska Dep., 38:25-39:5; Pls. Ex. 3, Cory Dep., 21:6-11.
[215] *Id.* Boska Dep., 39:23-40:6; *Id.* Cory Dep., 21:9-11.
[216] Pls. Ex. 2, Boska Dep., 40:20-21.
[217] Pls. Ex. 3, Cory Dep., 27:23-28:7.
[218] Pls. Ex. 2, Boska Dep., 135:20-25; Pls. Ex. 3, Cory Dep., 26:21-24.
[219] Pls. Ex. 2, Boska Dep., 136:20-23; Pls. Ex. 3, Cory Dep., 27:6-8.
[220] *Id.*  Boska Dep., 137:2-12.
[221] *Id*. at 139:12-15; 140:2-4.

are [not] HR."[222]

67.    Furthermore, Boska was not provided training on interviews and was never instructed not to engage in interviews or note-taking.[223]

68.    To corroborate Boska and Cory's testimony, Boldman stated that upon review of employment records, he was unable to find any documentation to substantiate the "actual training" Boska and Cory received.[224]

69.    Additionally, after attempting to research whether Boska and Cory had been trained on the interview processes, Boldman was unable to find what type of training that was actually provided.[225]

70.    Also, while investigating the proffered reasons for Boska and Cory's termination, Boldman never gathered information from Boska or Cory about whether they had received training on the fact that taking interview notes was a violation of Wayfair's policies or what to include in interview notes.[226]

71.    Watson also discussed that managers were "told not to lie on the [interview] form[s]" and denied that any training that would have been given on omitting what a candidate had said in the event that the comment could be construed as discriminatory.[227]

72.    Boldman claims Orehoski informed him that Boska and Cory received training on taking interview notes.[228]   However, Orehoski testified that she did not personally provide interview training to Boska or Cory and she could not confirm if the note-taking during interviews

---

[222] Pls. Ex. 3, Cory Dep., 38:19-24.
[223] Pls. Ex. 2, Boska Dep., 204:21-205:5.
[224] Plaintiffs' Ex. 13, Boldman Dep., 16:8-19.
[225] *Id*. at 17:24-18:15.
[226] *Id*. at 25:2-19; 25:25-26:3.
[227] Plaintiffs' Ex. 4, Watson Dep., 44:20-45:5.
[228] Plaintiffs' Ex. 13, Boldman Dep., 16:8-17:3.

was a part of the training, including noting that someone was discriminatory against age or discussed their medical issues being a violation of Wayfair's policies.[229]

73.     While Orehoski claims the training would have been completed by talent management, Erickson, confirmed that talent management did not provide any sort of training regarding how to conduct the interviews and how to enter notes as a part of the interviews[230]

B.     *Wayfair's proffered reasons for Boska and Cory's termination are false and instead in retaliation for participating in a protected activity.*

74.     On October 18, 2018, Tammy Schade sent an email to Boldman regarding a response received from a potential candidate interviewed by Boska and Cory.[231]

75.     The interview conducted by Boska and Cory occurred on August 6, 2018.[232]

76.     Boska and Cory were not informed about the complaint until they were terminated from their employment.[233]

77.      In fact, Boldman failed to interview Cory or Boska during his investigation into the complaint.[234]

78.     Boldman further claims this was the most involvement he had ever had in an hourly selection process.  Boldman was not normally part of the process.[235]

79.     Cory expressed that she believes she was retaliated against for having used FMLA leave because she was terminated from her job shortly thereafter.[236]  Cory further states the interviews used to terminate her had "no actual backbone," and rather Wayfair was "just looking

---

[229] Plaintiffs' Ex. 5, Orehoski Dep., 102:14-103:12.
[230] *Id*. at 102:14-19; Pls. Ex. 12, Erickson Dep., 30:20-31:1.
[231] Plaintiffs' Ex. 15.
[232] Wayfair. Ex.13, 14.
[233] Pls. Ex. 3, Cory Dep., 43:17-45:17; Pls. Ex. 2, Boska Dep., 155:16-24.
[234] Pls. Ex. 13, Boldman Dep., 24:23-25:13.
[235] *Id*. at 40:4-7.
[236] Pls. Ex. 3, Cory Dep., 68:23-7.

for something to terminate [her]."[237]  To support her claim, Cory continues, "I had no discussions in the two weeks that I was there.  There was no discussion with them, with us, to, you know, see our side of the story.  They definitely could have come to myself and Kalie…and asked me questions about these interviews before just taking the word of the interviewee, and that [is] what they based everything on."[238]

80.     Boska also stated that she believes she was terminated, "…in retaliation for exercising [her] rights to FMLA leave," because, "…they could[not] find another reason to terminate me, because the PIP did[not] work when they tried to terminate me in January of 2017."[239]  To support her belief, Boska states, "I was gone for six months," and that, "…people [told her] that [she] was supposed to be terminated a month after [she] got back from [her] last FMLA leave from cancer," and they had been trying to find a way to terminate her, "since [she] came back from leave."[240]

C.     _Boska and Cory's termination._

81.     Boska and Cory were terminated from Wayfair on November 1, 2018, without being given the opportunity to object to the termination, were not interviewed to provide their side of the story and were unaware that they even had the opportunity to appeal the termination decision.[241]

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

---

[237] _Id_. at 69:8-17.
[238] _Id_. at 69:18-70:3.
[239] Pls. Ex. 2, Boska Dep., 114:24-115:5.
[240] _Id_. at 115:6-8; 115:23-116:8; 152:23-153:1
[241] Pls. Ex. 2, Boska Dep., 150:20-24; 152:16-21; Pls. Ex. 13, Boldman Dep., 24:23-25:13; Pls. Ex. 3, Cory Dep., 43:6-20; Ex. 2; Ex. 3.

and the movant is entitled to judgment as a matter of law."[242] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[243] In determining whether there is a genuine dispute of material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[244] The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[245] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[246] However, if the nonmoving party "bears the burden of persuasion of a claim at trial," such as in this case, "the nonmoving party [remains] entitled to all reasonable inferences from the record."[247]

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[248] Even where a movant's facts are undisputed, if two reasonable fact-finders could reach different conclusions or "ultimate inferences" from the undisputed facts, summary judgment is not warranted.[249] When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[250]

---

[242] Fed. R. Civ. P. 56(a).
[243] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).
[244] *Id.*
[245] *Id.* at 670-71.
[246] *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).
[247] *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).
[248] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[249] *See Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1382 (10th Cir. 1980) (citations omitted).
[250] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## ARGUMENT

## I.    PLAINTIFFS' FMLA CLAIMS ARE SUPPORTED BY THE EVIDENCE

Defendants argue that they are entitled to summary judgment because some of Plaintiffs' claims are time-barred, and Plaintiffs cannot establish that Wayfair violated the FMLA.[251] Wayfair's arguments lack merit.

### A.    *Plaintiffs' Claims are Not Time-Barred*

Wayfair argues that any retaliatory conduct that took place prior to December 20, 2017 is time barred. Of course, the primary adverse action complained of by Plaintiffs is their termination, which occurred on November 8, 2016, well before this arbitrary deadline. This date is well within the two-year statute of limitations for FMLA claims, and Wayfair makes no argument that Boska's termination under the ADA is time barred due to exhaustion or a late filing with the UALD/EEOC.

With respect to those items occurring prior to December 20, 2017, the U.S. Supreme Court had made clear that discrimination laws, such as the ADA and Title VII do "not bar an employee from using the prior discrete acts as background evidence in support of a timely claim.[252]

FMLA claims generally must be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought" unless the plaintiff can establish a "willful" violation of FMLA, in which case the statute of limitations is three years.[253] In order for the three-year limitations period to apply, a plaintiff must demonstrate that his employer "knew or showed reckless disregard" for whether its conduct was prohibited by the FMLA.[254] "Willful conduct" is considered to be actions which are known to violate the FMLA or

---

[251] Defendants' Motion for Summary Judgment, pp. 17-26.
[252] *AMTRAK v. Morgan,* 536 U.S. 101, 113, 122 S. Ct. 2061, 2072 (2002).
[253] 29 U.S.C. § 2617(c).
[254] *Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008).

are taken in reckless disregard of the FMLA.[255] Here, the evidence shows Wayfair's violations of FMLA were willful, and as such, the three-year statute of limitations applies and all adverse actions after December 20, 2016 are relevant.

Boska can establish that Wayfair engaged in willful conduct when it violated the FMLA. Wayfair became aware of Boska's accommodation request and FMLA in October 28, 2016, when she applied for FMLA leave.[256] Boska returned to the office on December 8, 2016, and immediately received a list of expectations for the next thirty and sixty days from Dunn.[257] Boska then requested and was approved for FMLA to undergo a scope procedure for her pancreatitis from December 20, 2016 through January 3, 2017.[258] In response to her request for leave, Miles Dunn told Boska and others in an email that "she should only be taking time off when she is physically incapable of working, and that any time off using FMLA should not be used for vacationing or activities…"[259] Dunn stated that Boska taking this time off "conveniently line[d] up with the holidays."[260] Dunn further attacked her use of FMLA by discussing the "perception that she is building with her peers of not being here to help with the holidays and not being committed to the team."[261]

After she returned to work, Boska was placed on a Performance Improvement Plan by Orehoski and Dunn.[262] On January 23, 2017, Boska submitted a complaint to William Quick, Human Resources, stating she had "requested to have an accommodation, intermittent leave, or to work from home due to the extreme pain [she] was in" but that she was told, "no, and that [she]

---

[255] *Id.* at 1103-1104.
[256] Wayfair Ex. 24.
[257] Plaintiffs' Ex. 22.
[258] Wayfair Ex. 24.
[259] Plaintiffs' Ex. 28, Email from Dunn to Orehoski and Erickson.
[260] *Id.*
[261] *Id.*
[262] Wayfair Ex. 36.

could go lay in [her] car or the health room to rest on breaks and lunch."[263] Subsequently, Quick opened an investigation into Boska's allegations of retaliation for taking FMLA.[264] In response it was found that Orehoski and Dunn had acted wrongfully and the final warning and PIP were removed.[265]

During 2017, when Boska tried to use intermittent leave time, she was harassed and told by her boss, Orehoski, to "go sit in a quiet room or out in [her] car and sleep it off" and "rather than going home," she needed to "go take a nap in [her] car or in the mother's room/quiet room, sick room, before leaving."[266]

The actions by Boska's supervisors after December 20, 2016 show that they were aware of Boska's medical needs, which included a cancer diagnosis, and yet still took steps to purposefully discourage her from making use of her approved FMLA leave and retaliated against her because of her disability. In fact, even Wayfair found that such a violation had occurred. As set forth above, Boska's supervisors embarrassed her by claiming there was a "perception" about her and that her coworkers questioned her commitment to the team. They accused her of using FMLA "conveniently" over the holidays and told her to not use it for vacationing or activities. They put her on oppressive performance improvement plans only days after she returned to work, and it was not until she submitted a formal complaint that the plan was removed. Boska has undoubtedly produced enough evidence to create a genuine dispute of material fact that Wayfair's discriminatory and retaliatory response to Boska's use of FMLA time was done willfully, and therefore the three-year statute applies to her claims. At a minimum, there is a question of fact for trial concerning this issue for those events preceding her termination that occurred prior to

---

[263] Plaintiffs' Ex. 23; Ex. 8.
[264] Plaintiffs' Ex. 24, Quick Investigation Report.
[265] Plaintiffs' Ex. 2, Boska Dep., 107:12-19.
[266] *Id*. at 80:14-20; 81:6-13.

December 20, 2017.

Cory's claimed adverse actions, despite Wayfair's contention to the contrary, largely occurred on or after December 20, 2017, so regardless of which statute of limitations applies to her claims, they are certainly not time barred under the FMLA. Indeed, there is no basis for arguing that any of the adverse actions she complains of fall outside of the applicable limitations period under the FMLA.

B.    *Plaintiffs Can Establish Wayfair Violated the FMLA*

The Tenth Circuit recognizes two theories of recovery in FMLA claims: "an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)."[267] The Tenth Circuit analyzes FMLA retaliation and discrimination claims under the three-step *McDonell Douglas* framework articulated by the Supreme Court of the United States.[268] The *McDonnell-Douglas* framework involves three steps: (1) the plaintiff must establish a prima facie case of retaliation; (2) the defendant employer must offer a legitimate non-retaliatory or discriminatory reason for the adverse employment action; and (3) the plaintiff must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.[269]

Although a "burden," the burden Courts place upon plaintiffs at the *prima facie* stage is light. Courts have stated the plaintiff's burden at the *prima facie* stage requires only a "small amount of proof necessary to create an inference" of retaliation or discrimination [270] by "a

---

[267] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).
[268] *Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 538 (10th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).
[269] *Id.*
[270] *Smothers*, 740 F.3d at 539.

preponderance of the evidence."[271] Simply put, the plaintiff's burden is "not onerous."[272]

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show (1) she engaged in a protected activity by taking FMLA-protected leave; (2) the employer "took an action that a reasonable employee would have found materially adverse;" and (3) a causal connection exists between the protected activity and the adverse action.[273] Here, Wayfair only challenges what actions are adverse and whether a causal connection can be established by Plaintiffs.[274]

There is really no dispute that the first two prongs are met in this case. Plaintiffs engaged in a protected activity by requesting and taking FMLA leave, and Wayfair took materially adverse action against them by terminating their employment.   However, Wayfair engaged in other behaviors that constitute materially adverse actions: actions that may dissuade a reasonable worker from engaging in protected activity are sufficient to create a genuine issue of fact regarding retaliation.

### i.    Materially Adverse Action

Wayfair argues that the warnings, performance improvement plans, and evaluation ratings provided to Plaintiffs do not constitute adverse actions.[275] This type of categorial exclusion is inconsistent with settled Tenth Circuit case law, which requires a case-by-case approach.[276]  To show that an adverse is materially adverse, "[t]he employer's action must result

---

[271] *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

[272] *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1197 (*quoting Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253(1981)); *see also Tabor v. Hilti, Inc*., 703 F.3d 1206, 1216 n. 4 (10th Cir. 2013) (prima facie burden is "slight"); *Annett v. Univ. of Kan*., 371 F.3d 1233, 1241 (10th Cir. 2004) (prima facie burden is "relatively lax").

[273] *Hibben v. Potteiger*, No. 16-CV-111-JFJ, 2019 U.S. Dist. LEXIS 6335, at *13-14 (N.D. Okla. Jan. 2019) (citing *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).

[274] Motion for Summary Judgment, pp. 18-20.

[275] Motion for Summary Judgment, pp. 19-20.

[276] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)

in *material* harm to the employee, meaning "significant" rather than "trivial" harm."[277] "This test

is an objective standard, referring to the actions of a 'reasonable' employee."[278] In applying this

test, the court must focus "on the materiality of the challenged action and the perspective of

a reasonable person in the plaintiff's position" in order to "screen out trivial conduct while

effectively capturing those acts that are likely to dissuade employees" from engaging in protected

activity."[279] Under this standard, adverse actions can come in a variety of forms that are material

to an employee, including coworker hostility or retaliatory harassment,[280] disciplinary

proceedings that adversely affect the terms and conditions of employment,[281] or warning letters

or reprimands that affect the likelihood that the plaintiff will be terminated, undermines the

plaintiff's current position, or affects the plaintiff's future employment opportunities.[282]

     In Boska's case, as noted above, she faced substantial coworker hostility and retaliatory

harassment directly because she made use of FMLA leave time. Her own supervisor, Miles Dunn,

demeaned, belittled, and harassed her via an email for taking leave time, and included other

workers in the email. Dunn told Boska and others in an email that "she should only be taking time

off when she is physically incapable of working, and that any time off using FMLA should not be

used for vacationing or activities…"[283]   Dunn further stated that Boska taking FMLA leave

"conveniently line[d] up with the holidays," casting doubt at her medical conditions. Dunn further

attacked her use of FMLA by discussing the "perception that she is building with her peers of not

---

[277] *Hibben v. Potteiger,* No. 16-CV-111-JFJ, 2019 U.S. Dist. LEXIS 6335, at *15 (N.D. Okla. Jan. 14, 2019) (citations omitted).
[278] *Id.* (citations omitted).
[279] *Id.* (citing *Burlington*, 548 U.S. at 69-70).
[280] *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).
[281] *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998); *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).
[282] *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005).
[283] Plaintiffs' Ex. 28.

being here to help with the holidays and not being committed to the team."[284] Dunn and Orehoski both were included on the demeaning email. They knew about the harassment and even participated in it.

Boska's letter she wrote confirms this when she noted that she felt like "there is a clear effort on the part of my supervisors to cause me to terminate my employment or quit."[285] The harassment Boska faced shortly after taking her FMLA leave was an adverse action inextricably linked to her use of FMLA leave.

Shortly after she returned from her second short-term leave, Dunn immediately placed her on a performance improvement plan under Orehoski's direction to manage her out and fire her.[286] After an investigation found that placing her on the PIP was wrong, Dunn was disciplined by Wayfair.[287] Dunn admitted that it was Orehoski who told him to place her on the PIP, that Orehoski told him to fire Boska, and that he had not worked at Wayfair long enough to know whether Boska needed to be on the PIP.[288] This written letter and Performance Plan stated plainly: "If all expectations are not met weekly, the result will be termination of employment."[289] As stated above, reprimands can constitute adverse actions if it affects the likelihood plaintiff will be terminated.[290] Boska was told by this PIP that any week could be her last. Additionally, after making use of her leave, Boska's shift was changed, she was moved to a different area, reassigned a new team, ignored by managers, and demeaned by her supervisors, including Orehoski.[291]

After requiring extended leave due to a cancer diagnosis and treatment, Boska received an

---

[284] *Id.*
[285] Plaintiffs' Ex. 8 and 23.
[286] Pls. Ex. 6, Dunn Dep., 12:17-21.
[287] *Id.* at 7:3-21.
[288] *Id.* at 9:10-10:10, 12:2-21.
[289] Wayfair Ex. 36.
[290] *Medina*, 413 F.3d at 1137.
[291] Plaintiffs' Ex. 2, Boska Dep., 106:2-16; 127:11-128:14.

unwarranted written warning for misconduct after attempting to diffuse an argument between two managers.[292] There was no reason to discipline Boska. Yet, Boska was given a written warning even though she was the person attempting to diffuse the situation between two coworkers.[293] The substantial, unnecessary scrutiny Boska received was severe, pervasive, and adverse, and such actions certainly could dissuade a reasonable person from continuing to engage in protected activity. This is an issue to be decided by a jury.

Cory also faced unreasonable scrutiny for using her FMLA leave and faced adverse actions in addition to being terminated. On February 27, 2018, Cory was given a Performance Improvement Plan ("PIP"), which falsely alleged that she had received low ratings on her performance, when in fact her overall performance was rated as "Meets Expectations" for her Summer 2017 Review and a "Meets Expectations" for her Winter 2017 Review. The manager who placed her on the PIP was only her manager for a short period of time, but she was placed on a PIP anyway.[294] Shortly after Cory returned from using her FMLA leave, she was subjected to an investigation into interviews she had conducted with Kalie Boska approximately three (3) months prior.[295] Then she was terminated based upon false allegations of policy violations, based upon a sham investigation.[296]

But, even if the above facts considered in their totality do not constitute materially adverse actions by Wayfair, it is undisputed that Plaintiffs were terminated and that such terminations are adverse actions. And, as noted above, this background evidence is at least relevant to their claims of termination, because all of the key incidents followed Plaintiffs' requests and uses of FMLA

---

[292] *Id.* at 158:12-19; Pls. Ex. 11, Heidrick Dep., 19:2-14.
[293] *Id.*
[294] Pls. Ex. 2, Cory Dep., 59:18-22
[295] *Id.* at 40:14-22.
[296] *Id.* at 43:5-20; Ex. 2.

leave, and Orehoski was involved in Boska and Cory's terminations, and her prior treatment is relevant to her decision to terminate Boska and Cory.

*ii.    Causal Connection*

The "critical inquiry" at this prima facie stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination."[297] The Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive."[298]

Here, the evidence creates a genuine dispute of material fact because the timing of the termination and the circumstances that lead to their termination. Plaintiffs were both terminated on November 1, 2018. On October 18, 2018, Tammy Schade sent an email to Fred Boldman, Talent Management Manager, regarding a response received from a potential candidate interviewed by Boska and Cory.[299] Boska and Cory were not informed about the complaint until they were terminated from their employment.[300] Of note, the interview at issue occurred on August 6, 2018, approximately two months *prior* to Wayfair responding to the candidate's survey.[301] The candidate complained that he was being discriminated against because of his age in response to a survey initiated by Wayfair.[302] After investigation, Boldman search for and found another candidate Plaintiffs interviewed where they noted the candidate had stated "have missed days due to medical issues."[303]

---

[297] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)
[298] *Metzler*, 464 F.3d at 1171 (internal quotations omitted).
[299] Pls. Ex. 15
[300] Pls. Ex. 3, Cory Dep., 43:17-45:17; Pls Ex. 2, Boska Dep. 155:16-24
[301] Pls. Ex. 15
[302] *Id*.
[303] Pls. Ex. 13, Boldman Dep., 42:15-25.

First, in Cory's case, she had only returned from her medical leave approximately two weeks before her termination.[304] But this alone is not the only fact supporting the causal connection. Wayfair claims Cory and Boska were terminated for violating Wayfair interviewing policy for the notes made during their interviews. Yet, such allegations are demonstrable false, and no reasonable person could believe that Boska or Cory did anything wrong during the interviews or violated any policies of Wayfair. Indeed, Wayfair cannot identify any policies that were violated. Tellingly, neither Boska nor Cory received substantial training on the interview process.[305] Boska never received training on company interview practices and Cory recalls only being given "guidelines."[306] Boska was also never made aware of what may be considered discriminatory practices during the interview process, including what proper and improper notes on interviews were.[307] Cory further states that they were only told "not to discuss medical issues because they are [not] HR."[308]

To corroborate Boska and Cory's testimony, Boldman stated that upon review of employment records, he was unable to find any documentation to substantiate the "actual training" Boska and Cory received.[309] Additionally, after attempting to research whether Boska and Cory had been trained on the interview processes, Boldman was unable to find what type of training that was actually provided.[310] While investigating the proffered reasons for Boska and Cory's termination, Boldman never gathered information from Boska or Cory about whether they had received training on the fact that taking interview notes was a violation of Wayfair's policies or

---

[304] Pls. Ex. 3, Cory Dep., 43:5-20; Ex. 2.
[305] Pls. Ex. 2, Boska Dep., 40:20-21; Pls. Ex. 3, Cory Dep., 27:23-28:7
[306] Pls. Ex. 2, Boska Dep., 136:20-23; Pls. Ex. 3, Cory Dep., 27:6-8.
[307] Pls. Ex. 2, Boska Dep., 139:12-15; 140:2-4.
[308] Pls. Ex. 3, Cory Dep., 38:19-24.
[309] Pls. Ex. 13, Boldman Dep., 16:8-19.
[310] *Id*. at 17:24-18:15.

what to include in interview notes.[311] In fact, Boldman failed to interview Cory or Boska during his "investigation" into the complaints.[312] Orehoski testified that she did not personally provide interview training to Boska or Cory and she could not confirm if the note-taking during interviews was a part of the training.[313] Boldman further claimed this was the most involvement he had ever had in an hourly selection process.[314] Although the interviewee accused Plaintiffs of discrimination well after the interview occurred, during the interview, the interviewee discussed hiring a "Mexican man," who quit, and he later found out the man murdered a man and buried him in basement, and that he "will never hire another Mexican man again."[315]  Accordingly, both Boska and Cory felt that "referring to his employee as 'The Mexican' was problematic for Wayfair."[316] They also noted he tended to not use politically incorrect wording.[317]

The details surrounding the investigation and the reasons for their termination create an inference of a causal connection between Plaintiffs' protected activity and Wayfair's adverse action. Cory further testified the interviews used to terminate her had "no actual backbone," and rather Wayfair was "just looking for something to terminate [her]."[318] In fact, during her two weeks back after her leave and before her termination, no one reached out to her regarding the investigation of the interviews, nor where they ever told what policy they violated.[319] Boska added that based on the fact that, as discussed above, Wayfair had already tried to use a PIP to terminate her, and her supervisor's testimony that she was targeted for termination, she was terminated

---

[311] *Id*. at 25:2-19; 25:25-26:3.
[312] *Id*. at 24:23-25:13.
[313] Pls. Ex. 5, Orehoski Dep., 102:14-103:12.
[314] Pls. Ex. 13, Boldman Dep., 40:4-7.
[315] Ex. 2, Boska Dep., 144:23-145:6.
[316] Ex. 3, Cory Dep. 41:6-8.
[317] Wayfair Ex. 13; 14.
[318] Pls. Ex. 2, Cory Dep., 69:8-17.
[319] *Id*. at 69:18-70:3; 49:6-11; Ex. 2, Boska Dep., 151:18-152:2.

November 1, 2018, because they could not find another reason to do so.[320]

Both Plaintiffs testified that they believed they were terminated for making use of their FMLA time.[321] Plaintiffs have presented enough evidence and the facts proffered herein reflect that Wayfair's actions occurred under circumstances which give rise to an inference of unlawful discrimination, rendering summary judgment improper.  There are genuine issues of fact for a jury to decide.

Additionally, Orehoski's well documented animus toward Boska and her leave also supports a finding of causation.[322] These comments occurred throughout Boska's FMLA leave and Orehoski was undoubtedly involved in the decision to terminate Boska and Cory. She also represented  - falsely – to Boldman that Cory and Boska had received training on not documenting issues related to protected categories in interviews, undoubtedly influencing the decision to terminate Boska and Cory's employment.

### iii. Pretext

Lastly, even if Wayfair can proffer a legitimate reason for the adverse employment action, summary judgment is not appropriate because Plaintiffs can show there is at least a genuine issue of material fact as to whether Wayfair's proffered legitimate reason is genuine or pretextual.

"A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[323] A plaintiff may show pretext by demonstrating the "proffered reason is factually false," or that "discrimination was a primary factor in the employer's decision."[324] Pretext may be

---

[320] Pls. Ex. 2, Boska Dep., 114:24-115:5.
[321] *Id*.; Pls. Ex. 3, Cory Dep. 68:23-25.
[322] *Minshall v. McGraw Hill Broad. Co.,* 323 F.3d 1273, 1281 (10th Cir. 2003)
[323] *Zamora v. Elite Logistics, Inc*., 478 F.3d 1160, 1166 (10th Cir. 2007).
[324] *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016).

established by revealing "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[325]

Importantly, Plaintiffs may use the same evidence used to show causation to support pretext.[326] Hence, the arguments set forth above create a genuine issue for trial.

Here, there are a number of additional ways Plaintiffs can show pretext. First, there is considerable evidence showing Wayfair's claims that Plaintiffs violated its Code of Conduct in how they conducted interviews is demonstrably false. Evidence showing the employer provided a false reason is sufficient to show pretext.[327] Here, there is no evidence Boska or Daimaru did anything wrong, violated any policy or directive given to them or engaged in any misconduct. Wayfair claims that its reasons for terminating Plaintiffs was for policy violations during two interviews they performed. Here, the undisputed facts show:

- Wayfair did not provide training and only discussed conducting interviews when "new processes" were put into place and only provided Plaintiffs with "guidelines".[328]
- Upon review of Wayfair's documents, Boldman could not find any documents that outline actual training that Boska or Cory received, or that was given to them.[329]
- Boldman also stated that he could not find any records of training related to the policies cited in Boska or Cory's termination, nor training on candidate interviews.[330]
- The interviewee from the first complaint did not specifically recall being asked about his age.[331] He also made negative comments about Mexicans, younger individuals, told a story about not hiring a Mexican, and made comments about being "smarter than the younger generation," "he knew more," "he may not know computers very well, but he is smarter in

---

[325] *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).
[326] *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1122 (10th Cir. 2001) (holding that a plaintiff may rely on the same evidence to prove her *prima facie* case and show pretext).
[327] *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1310 (10th Cir. 2005); *Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000).
[328] Pls. Ex. 2, Boska Dep., 137:2-7; Ex. 4, Cory Dep. 27:6-10.
[329] Pls. Ex. 13, Boldman Dep., 16:3-19.
[330] *Id*. 53:23:54-8; 54:16-20.
[331] Plaintiffs' Ex. 14.

every other way than the younger generation."[332]

- When interviewing the interviewee from the second complaint, neither Boska nor Cory mentioned anything about her medical issues and interview brought up the medical issues on her own.[333]
- This second interviewee was later hired for the position.[334]
- There is no evidence proffered by Wayfair of any policy at all showing the Boska or Cory were directed not to do what they did.
- There is no evidence that Boska or Cory received any training that would have warned them to not do what they did.

Notably, Wayfair's Motion argues that Plaintiffs were terminated for violating its "Code of Conduct and EEO policies during the interviews in question."[335] Wayfair fails to cite to a specific provision in its Code that applies to Plaintiffs' termination besides one general "catch-all" code that prohibits actions detrimental to the best interest of Wayfair.[336] Wayfair *fails* to cite to or refer to a specific code, provision, or policy regarding interview conduct, training, or the notes that can be taken in interviews. Wayfair's attempt to justify Plaintiffs' terminations can be shown to be pretextual because they applied policy and held Plaintiffs accountable for policy that simply did not exist. A jury could certainly find that Plaintiffs did not violate the Code of Conduct or any other policy and that this reason is pretextual.

Second, the sham investigation conducted by Wayfair into the allegations made by the first interview and its review of other interviews done by Plaintiffs to find additional violations, shows pretext. The evidence, viewed in the light most favorable to Plaintiffs, shows that Wayfair's investigation was a sham, and that it targeted two employees who both made use of FMLA leave, including one within the last 15 days.[337] Wayfair did not interview, obtain statements, or otherwise

---

[332] Pls. Ex. 2, Boska Dep., 144:8-147:7; Pls. Ex. 3, Cory Dep., 40:20-41:17.
[333] Pls. Ex. 2, Boska Dep., 141:14-18; Pls. Ex. 3, Cory Dep., 38:8-10.
[334] Pls. Ex. 13, Boldman Dep., 31:10-23
[335] Defendants' Motion for Summary Judgment, p. 24.
[336] *Id*. at 15.
[337] *Dewitt* v. *Southwestern Bell Telephone Co.,* 845 F.3d 1299, 1318 (10th Cir. 2017) 845 F.3d at 1314 ("failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext."); see also *Trujillo v. PacifiCorp*, 524 F.3d 1149,

ask Plaintiffs why they did what they did. It did not ask them if they had been trained, if they knew they should not have documented what was said during the interviews or if they considered their interviews inappropriate in any manner. Wayfair also failed to consider the other *extremely* problematic comments made by one of the interview candidates, the fact he did not recall ever being asked about his age, and the fact that the second candidate was ultimately hired for the position that she interviewed for. Plainly and unmistakably, neither of these interviews resulted in anything that would have been "detrimental" to Wayfair or that a reasonable person in good faith could consider detrimental to Wayfair. Any claim that such a belief existed is defeated by Wayfair's impartial investigation. While nothing in the law required that Wayfair conduct an impartial investigation, and learn about the facts from Plaintiffs, a jury could certainly determine that the failure to do so constitutes pretext.[338]

Additionally, Plaintiffs have had no history or issues with this type of misconduct and the investigation that went into the two interviews failed to involve two important parties: the Plaintiffs themselves. The facts show that Plaintiffs have never had issues exhibiting discriminatory behavior or failing to follow Wayfair interview procedure, if such a thing exists. Plaintiffs also had no recent disciplinary actions against them that would give rise to termination.

Wayfair also argues that Plaintiffs "had an opportunity to dispute their terminations" but fails entirely to show any moment where they would have had that opportunity. At no time in their

---

1159 (10th Cir. 2008) ("We also consider the failure to interview Dan Michaelis in the course of the investigation a significant circumstance contributing to the inference of discrimination.")

[338] Nor does it matter that Boska had not recently taken FMLA leave. Such an argument would be akin to suggesting that the United States did not retaliate against Osama bin Laden for his atrocious attacks on September 11, 2001 because retaliation was not effectuated until years later, in May of 2011, when bin Laden was killed. The record here would certainly allow a jury to determine that Orehoski made multiple attempts to terminate Boska because of her leave and/or medical condition, many of which were unsuccessful, but ultimately succeeded in her efforts when she had the opportunity.

termination interview did Wayfair present an opportunity for Plaintiffs to "dispute" their termination or that any such dispute had any chance of success. Boldman never gathered information from Boska or Cory about whether they had received training on the fact that taking interview notes was a violation of Wayfair's policies or what to include in interview notes.[339] In fact, Boldman failed to interview Cory or Boska during his investigation into the complaint.[340]

Wayfair's proffered reasons for terminating Plaintiffs is unsupported. The evidence presented by Plaintiffs in opposition to their Motion creates a genuine dispute of material fact as to whether Wayfair's reasons for terminating plaintiffs were pretextual. For these reasons, summary judgment on Plaintiffs' FMLA claims is inappropriate and these claims should go to a jury.

## II.  BOSKA'S ADA CLAIMS ARE SUPPORTED BY THE EVIDENCE

The ADA provides in relevant part that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to" a number of actions by an employer, including "discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[341] To establish a prima facie case of discrimination under the ADA, a plaintiff must show (1) that she is disabled within the meaning of the ADA; (2) that she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that she was discriminated against because of her disability.[342] "An adverse employment action includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment

---

[339] Pls. Ex. 13, Boldman Dep., 25:2-19; 25:25-26:3.
[340] *Id*. at 24:23-25:13.
[341] 42 U.S.C. § 12112(a).
[342] *Davidson v. Am. Online, Inc*., 337 F.3d 1179, 1188 (10th Cir. 2003).

with significantly different responsibilities, or a decision causing a significant change in benefits."[343]

There is no dispute as to the first two prongs set forth above. Boska was disabled within the meaning of the ADA and qualified to perform the essential functions of her employment. As to the third prong, the evidence presented creates a genuine dispute of material fact as to whether she was discriminated against because of her disability. First, as set forth above, her termination was motivated in large part by her disability and not the pretextual reasons given by Wayfair. The evidence presented by Wayfair fails to show what, if any, policies Boska violated during the hiring interviews they allege were the basis for her termination, and its claim that she filed the Code of Conduct is demonstrably false. The first interviewee or candidate made remarks that were not in line with Wayfair culture and the facts show that he was not asked about his age during the interview. The second applicant was ultimately hired by Wayfair. The first applicant was reinterviewed and not hired.  If anything, Boska's actions in both interviews assisted Wayfair in avoiding an applicant who likely would not have succeeded at Wayfair and identified another who was ultimately hired.

Second, as noted above, immediately upon her return from her disability leave, Boska was subject to unfair, meritless, and discriminatory verbal and written warnings that were inconsistent with her previous reviews and unfairly singled out her behavior. On August 22, 2018, Boska received a written warning for "not promoting our team building and culture standards as a Manager by adding to and continuing to engage in the escalated conversation on the calling floor which created an unsafe environment for those involved."[344] However, Boska did not start or

---

[343] *Dick v. Phone Directories Co., Inc*., 397 F.3d 1256, 1268 (10th Cir. 2005) (internal quotation marks omitted).
[344] Wayfair Ex. 37.

escalate the issue, rather she attempted to "move it off the floor," and "tried to de-escalate the situation."[345] The warning was given to her by someone who was not Boska's supervisor.[346] Heidrick agreed that Boska was given the "written warning" because she "failed to de-escalate" the argument, not because of her behavior or because she was the cause of the argument.

This demonstrates that Boska was being unfairly targeted in this warning. This written warning undoubtedly caused a significant change in employment status because the warning included a threat that if Wayfair's expectations of her alleged "behavior" were not met, "it will result in further disciplinary action up to and including termination of employment."[347] Wayfair would have you ignore that the Tenth Circuit holds that a "disciplinary action on the part of an employer can constitute adverse employment action."[348] This is especially true when the disciplinary actions have a direct bearing on the future employment status.[349] Given that Wayfair attempts to argue that (without evidentiary support) that these written warnings are used in termination decisions, it is clear that this written warning was adverse. When combined with the fact that Dunn had testified that her supervisors were attempting to get her fired, a reasonable jury could conclude that this written warning was given with discriminatory motive in an attempt to establish a pretextual reason to terminate her.

Third, there is evidence to support that her July 2018 performance review, the August 22, 2018 written warning, the October 10, 2018 verbal warning, and her termination were based on a discriminatory motive. The Summer 2018 review does not provide a rating scale and Boska had only returned to work two (2) months prior to the review period of 01/01/2018 – 06/30/2018, as

---

[345] Plaintiffs' Ex. 3, Boska Dep., 168:8-18.
[346] Pls. Ex. 11, Heidrick Dep., 22:10-13.
[347] Wayfair Ex. 37.
[348] *See Roberts v. Roadway Express, Inc*., 149 F.3d 1098, 1104 (10th Cir. 1998)
[349] *Id*.

stated on the performance review.[350] Also, the team given to Boska was "only on the floor for a month and a half" wherein during that time they were already expected to be at their 60-day and 90-day statistical goals.[351] Her team had not even reached 60 days together, let alone 90, and holding Boska accountable for not achieving those goals has no fair basis or rational. In addition to these actions, after her return from leave, Boska was moved to different area, reassigned a new team, ignored by managers, and demeaned by her supervisors, including Orehoski, and then immediately given baseless and unfair warnings and write-ups.[352]

Therefore, based on a history of discrimination against her prior to her ADA leave, the testimony that her supervisors were actively attempting to fire her, the unfair grounds and lack of support for her written warning, the timing of the verbal warning, and the facts set forth above surrounding her termination, a reasonable jury could find that Wayfair discriminated against Boska in violation of the ADA and summary judgment in not appropriate on this claim. In short, causation and pretext may be established for the same reasons it can be established for Boska's FMLA claim.

## CONCLUSION

For the forgoing reasons set forth herein, Plaintiffs request that this Court deny Wayfair's Motion for Summary Judgment.

Dated this 4th day of April, 2022.

/s/   **Andrew W. Stavros**
Andrew W. Stavros
STAVROS LAW P.C.
*Attorney for Plaintiffs*

---

[350] Wayfair Ex. 42.
[351] Pls. Ex. 2, Boska Dep., 170:11-171:2.
[352] *Id*. at 127:11-128:14.

57

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of April, 2022, I delivered a true and correct

copy of the foregoing **PLAINTIFFS' MEMORANDUM IN OPPOSITION** with the Court

electronically using the court's CM/ECF system which sent notice to all counsel of record.

<u>  /s/ Jessika Clayton        </u>