IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALIE BOSKA and ANGELA CORY,<br><br>        Plaintiffs,<br><br>v.<br><br>WAIRFAIR, LLC and WAYFAIR OF DELAWARE, INC.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00993-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is a motion for summary judgment brought by Defendants Wayfair, LLC and Wayfair of Delaware, Inc. ("Wayfair"). ECF No. 66. The court held oral argument on the motion on July 14, 2022. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court DENIES Wayfair's motion for summary judgment.

## FACTUAL BACKGROUND

Wayfair is an online retail business that operates warehouses throughout the United States. Customers can order products on Wayfair's website, which the company then delivers from a warehouse.

Wayfair employed both Angela Cory and Kalie Boska. Wayfair hired Cory as a Customer Service Consultant on August 18, 2014. Wayfair later promoted Cory to a Service Team Supervisor on November 1, 2015. Following her promotion, Cory supervised a team of twelve to eighteen consultants who fielded phone calls from customers seeking assistance.

Wayfair hired Boska as an Email Supervisor on October 19, 2015. Similar to Cory, Boska supervised a team of twelve to eighteen consultants. Boska's team responded to email inquiries from customers. The following factual background details Cory's, then Boska's, record at Wayfair, followed by a summary of the events leading to their terminations.

## I.    CORY'S RECORD AT WAYFAIR

### A.    *Discipline*

Soon after Cory began working at Wayfair, she received two warnings regarding her attendance. On September 29, 2014, Cory received a verbal warning. Her supervisor at the time, Melissa Shupe, warned that Cory "must log in and be ready at the start of your scheduled shift and stay until the end of the shift." ECF No. 70 at 2. Shupe further warned that Cory was "expected to be here every scheduled work day." *Id.* On November 10, 2014, Cory received a nearly identical written warning. ECF No. 70-1 at 2. Both warnings stated that failure to comply could result in further disciplinary action, up to and including termination.

Cory's file also contains several "record of discussion" documents related to Cory's attendance record, her team's attendance records, or Cory's performance record. On April 20, 2015, Shupe issued a record of discussion with Cory where the pair discussed updates to the new attendance policy. Shupe also reminded Cory again that she "must log in and be ready at the start of [her] scheduled shift and stay until the end of the shift." ECF No. 70-2 at 3. And she again noted that Cory was "expected to be here every scheduled work day." *Id.* On October 13, 2016, another supervisor, Tony Duersch, documented another conversation with Cory after Cory's team was placed on the "Do Not Send Home Early" list due to attendance issues with team members. ECF No. 70-3 at 2. Finally, on April 28, 2017, Duersch documented a discussion with Cory about her failure to turn in data for a "First-Call Resolution Dive," which is a metric used by

Wayfair to measure how many customer calls were resolved in the first instance (i.e., the customer did not have to call back). ECF No. 70-4 at 2. Duersch reminded Cory that the FCR dive was mandatory and that that failure to complete the report could result in disciplinary action. *Id.*

### B. FMLA Requests

Cory submitted her first FMLA request about a month after her discussion with Duersch. On May 15, 2017, Cory requested leave from May 16, 2017 to May 22, 2017 due to gallbladder surgery. ECF No. 68-6 at 9, 11. Wayfair approved the request.

Cory again applied for FLMA leave from September 4, 2018 to October 16, 2018 for "a major medical surgery." *Id.* at 3-4. Wayfair approved the leave.

### C. Performance Reviews

When Duersch evaluated Cory for her work from January 2017 to June 2017, he rated her overall as "Meeting expectations for level." ECF No. 70-6 at 5.[1] When Cory's new supervisor, Ryan Fisher, evaluated Cory for the second half of 2017, he rated her as "Below Expectations for level." ECF No. 71 at 5.

The following year, on February 27, 2018, Cory's supervisor, Ryan Fisher, placed Cory on a performance improvement plane ("PIP"). The PIP noted that "[Cory] has struggled to meet and exceed team [p]erformance on a consistent basis" and described the issue as "[p]erformance [a]ccountability, [c]oaching [c]ompliance, and [m]anager [e]ngagement." ECF No. 70-5 at 2. The

---

[1] The court notes that Cory's PIP states the following: "1/1/2017 – 6/30/2017 Review rated a [sic] Needs Improvement. Focus was on Coaching Compliance, driving results through consultant accountability, and targeted team goals." ECF No. 70-5 at 2. Despite this note, the court finds no evidence indicating that Cory rated overall as "Needs Improvement" during the first half of 2017. Duersch rated her as "Needs Improvement" for the innovation and results competency but gave her an overall rating of "Meeting expectations for level." ECF No. 70-6 at 4-5.

PIP outlined a number of expectations for Cory, including holding weekly coaching sessions with consultants, making goals and incentives more visible to her team members, and becoming a leader by arriving first to meetings and actively engaging at the meetings.

Cory's performance evaluation for January 2018 through June 2018 reflected similar concerns. ECF No. 71-1 at 2. Cory's evaluator, Lani Watson, listed her as displaying "inconsistent performance" for all four competencies evaluated, as well as for her overall rating. *Id.*

As discussed in further detail below, Wayfair made the preliminary decision to terminate Cory on October 26, 2018 and ultimately terminated Cory on November 1, 2018.

## II.     BOSKA'S RECORD AT WAYFAIR

### A.     *Discipline Prior to FMLA Requests*

On August 29, 2016, Boska received a verbal warning from Kim Orehoski, the Director of Sales and Services for Wayfair's Orem site, regarding her engagement with her team. Orehoski warned Boska that she must ensure frequent communications with her team members, including engaging in weekly coaching sessions with subordinates and maintaining weekly team meetings. Orehoski further noted that Boska should frequently share team metrics with the team. The warning stated that failure to show improvement would result in further disciplinary action, up to and including termination.

### B.     *Discipline and FMLA Requests*

On October 28, 2016, Boska's doctor diagnosed her with pancreatitis. Boska immediately requested FMLA leave from her date of diagnosis until December 1, 2016. Her doctor noted that the pancreatitis caused vomiting, dehydration, and severe abdominal pain. Wayfair approved Boska's FMLA leave to manage her pancreatitis.

4

Soon after returning to work, Boska faced renewed disciplinary action. Specifically, her new supervisor, Miles Dunn, issued a written document outlining his expectations for Boska over the next thirty to sixty days. Dunn insists that he issued the document at Orehoski's behest. The expectations indicated concerns related to Boska's attendance and performance.[2] With regard to FMLA leave, the expectations stated that "[f]ederal medical leave of absence is there for people as a last resort when health has deteriorated to the point where an employee's health issues are affecting both their personal and professional ability to function." ECF No. 71-3 at 2. Moreover, Wayfair stated that "[w]hile FMLA will allow you to take time off from work when preapproved and necessary, it will not excuse performance." *Id.* The expectations further stated that "[f]ailure to meet the requirements of this plan will result in additional disciplinary action up to and including termination." *Id.*

---

[2] Specifically, the expectations stated the following:

- Any time away from the office will be either covered by FMLA or PTO. [Boska] will communicate any time off needs to her Senior manager prior to taking the time off. She will not rely on other managers for covering her time off unless in extreme circumstances and only with prior approval from her Senior manager.
- [Boska] will still meet performance expectations, including holding all of her formal and informal coaching sessions, attending management meetings, team meetings with her consultants, sending out stats regularly, and keeping her MPM entries up to date.
- [Boska] will work from the office going forward. If time is needed to rest in the Wellness room, that can be accommodate [sic] through her breaks, lunches, or other means as discussed with her Senior manager.
- [Boska] will assist the management team in covering the holidays. She will work the days of the 24th and 26th of December. She has not been present for any of the Thanksgiving holidays, including black Friday and cyber Monday. Subsequently, her peers on the management team have had to pick up the slack in her absence.
- You will not leave early from your regularly scheduled shift unless previously discussed with your Senior manager. Leaving early should not be the norm, but the exception.

ECF No. 71-3 at 2.

Boska took additional FMLA leave from December 20, 2016 to January 3, 2017. The purpose of the FMLA leave was to receive a "scope" procedure, which allows doctors to investigate the cause of a patient's pancreatitis. Wayfair again approved the FMLA leave. On January 9, 2017, shortly after returning from FMLA leave, Dunn placed Boska on a performance improvement plan ("PIP"). The PIP noted that "[Boska] has consistently failed to document and hold her people accountable in a timely fashion." ECF No. 71-4 at 2. It also complained that "[Boska] has failed to maintain an acceptable level of coaching compliancy for the past 6 months." *Id.* The PIP noted the prior verbal warning from Orehoski. *Id.* It further noted that "[t]ime away from work will not excuse performance standards" and that the expectations had no expiration date but rather were indefinite. *Id.* Finally, the PIP stated that "[i]f all expectations are not met weekly, the result will be termination of employment." *Id.*

In response to the PIP, Boska submitted a complaint of discrimination and retaliation to human resources. Boska specifically noted both instances where management disciplined her quickly after her return from FMLA leave. She also noted other perceived harassment from management and peers, including management's decision to move her to a less-desirable shift. Boska was clear about the alleged reason for the treatment she received: "I am in fear that I will be fired for no reason other than my own health and that I am being punished by management because I needed FMLA leave." ECF No. 85-5 at 4.

Boska's complaint led to an internal investigation at Wayfair. Ultimately, Wayfair terminated Dunn for issuing a PIP to Boska. Dunn maintains that Orehoski told him to put Boska on a PIP. Moreover, Dunn maintains that he was a new employee with little information about Boska's performance, outside of what Orehoski told him. Upon his termination, Dunn emailed human resources outlining his concerns with Orehoski's management and her handling of the

situation. Boska maintains that Wayfair retracted the PIP after terminating Dunn, but the court has no documentary evidence before it as to whether Wayfair left the PIP in place.

In February 2017, Boska requested intermittent FMLA leave to cope with flare ups related to her pancreatitis. Her doctor noted that she could need between one to five days off for any recurrent flare up. ECF No. 69 at 16. Wayfair approved the request.

On August 31, 2017, Boska's doctors diagnosed her with Hodgkin's lymphoma. In September 2017, Boska again applied for FMLA, this time for seven months of leave related to her chemotherapy regimen. Boska also requested an ADA accommodation, to work from home while undergoing chemotherapy treatment to avoid unnecessary exposure to illness while the chemotherapy weakened her immune system. Before Wayfair approved either request, Boska decided to take short-term disability leave instead. Boska was on disability leave from September 2017 to May 1, 2018.

Boska received an additional written warning on August 22, 2018. Logan Webster, her manager, issued Boska a written warning for adding to an escalated conversation between two other employees on the calling floor. Boska maintains that she was trying to break up a fight, but the warning states that Boska matched the volume when she approached the conversation.

### C. *Performance Reviews*

On October 11, 2018, Boska received a verbal warning from Webster regarding low ratings on her prior four performance reviews.[3] Boska had received the following overall ratings from her managers:

---

[3] Plaintiffs attempt to inject some doubt regarding the performance review ratings. The performance reviews contain a numerical scale with correlated ratings, i.e., 2 means "meeting expectations for level." But the standard scale given differs from the scale actually used by reviewers. Specifically, the standard scale indicates that 1 means "below expectation/needs improvement" and 3 means "exceeding expectations for level," but the scale that managers

- January 2016 – December 2016: "Below Expectations for level." ECF No. 72 at 4.
- January 2017 – June 2017: "Below Expectations for level." ECF No. 72-1 at 5.
- July 2017 – December 31, 2017: "Below Expectations for level." ECF No. 73 at 5.
- January 2018 – June 2018: "Inconsistent performance." ECF No. 73-1 at 2.

## III.   INTERVIEW AND TERMINATION

At Wayfair, managers interviewed candidates in pairs. On August 6, 2018, Boska and Cory interviewed an unnamed candidate for a position at Wayfair. About two months after the interview, the candidate received a follow-up survey.[4] The candidate indicated on his survey that he felt that his interviewers had discriminated against him based on his age. The candidate complained that a recruiter told him that Wayfair had elected not to hire him based on his lack of experience. But the candidate believed that, because his resume demonstrated significant relevant experience, experience had nothing to do with the decision. Rather, he believed Wayfair's decision to decline to hire him was based on his age.

---

actually used listed 1 as meaning "meeting expectations for level" and 3 as "below expectations/needs improvement." *See, e.g.*, ECF No. 72-1 at 4. Plaintiffs argue that the court should apply the meanings assigned to the numbers in the standard scale.

But Boska's deposition indicates that she understood the operative ratings to be the ones that the managers actually listed, not the meanings given to each number on the standard scale. For instance, counsel asked Boska about her Summer 2017 review and indicated that her manager, Lani Watson, rated her as "3 - below expectations." ECF No. 66-4 at 24. When counsel asked if she discussed her rating with Lani, Boska testified that they discussed the "below expectations" rating. *Id.* at 25. At no point during her deposition did Boska dispute that she received an overall rating of "below expectations" in Summer 2017. This indicates to the court that Boska understood that she received an overall rating of "3 - below expectations," despite the fact that, on the standard scale, 3 correlated to "exceeding expectations for the level."

[4] Wayfair had a practice of sending interviewees a follow-up survey, allowing them to provide feedback about their interview experience.

After receiving this complaint, Wayfair conducted an investigation. Fred Boldman, a human resources manager at Wayfair, spoke with the candidate on the phone. Boldman summarized a number of points from the conversation in a follow-up email, including:

- "You think that the two interviewers may have asked you your birthdate but when I asked you to confirm that, you don't recall specifically that they did and/or can't verify that for sure." ECF No. 67-1 at 2.
- "Although you don't specifically recall that you were asked about your age, you feel that you were discriminated against based on your age because of the outcome of the interview." *Id.*

Wayfair's investigator also noted several statements written in the "Additional Notes" section by Cory and Boska. Specifically, he noted that Cory and Boska wrote that the candidate "[a]dmitted he's not good with technology" and "is discriminatory again [sic] age." ECF No. 67-2 at 3.

Wayfair did not speak to Boska or Cory about their experience during the interview. When later asked in a deposition why she and Cory did not recommend his hiring, Boska testified that she felt that the candidate made several remarks during the interview that did not comport with Wayfair's culture, specifically, remarks that Boska and Cory construed as racist and ageist. Plaintiffs' comments in the "Additional Notes" section reflect similar concerns: "He tends to not use Politically correct wording" and he "is discriminatory again[st] age." *Id.*

Based on the initial investigation's findings, Orehoski requested that the HR department investigate other interviews by Boska and Cory. The further investigation uncovered one additional interview that Wayfair found objectionable. Boska and Cory conducted an interview on August 1, 2018 with a candidate who Wayfair ultimately hired. However, Boska and Cory recorded in their interview notes that the candidate "ha[d] missed days due [to] medical issues" and that the candidate "[m]entioned some medical problems that have prevented her from coming to work and or leav[ing] work early." ECF No. 67-3 at 2-3. Wayfair objected to the fact that Cory and Boska recorded medical information about the candidate. Wayfair believed that if a

candidate raised a medical issue, the interviewer was supposed to thank the individual for raising the issue and let the candidate know that HR would reach out about the concern. *See* ECF No. 67 at 9. According to Boldman, an interviewer should never include a record of the medical concern in the written interview notes.

Wayfair made a preliminary decision to terminate Boska and Cory on October 26, 2018. Orehoski and several human resources employees determined that Boska and Cory violated Wayfair policy by including the potentially discriminatory comments in the interview notes.

Boska and Cory were surprised to learn of the basis for their termination. Boska testified that she never received training on how to conduct an interview. Cory only remembers receiving "guidelines" regarding interviews, not exact details. *See* ECF No. 66-3 at 5. She remembers that she was told "not to discuss medical issues because we weren't HR." *Id.* at 8. Neither employee viewed their actions as violating Wayfair policy as they understood it.

Boldman also conducted an investigation into the training that Boska and Cory received. *See* ECF No. 67 at 3. Boldman testified that Orehoski told him that Boska and Cory had received training on interviewing. *Id.* However, Boldman never uncovered any documentary evidence of this training, such as PowerPoints or handouts, nor any documentary evidence, such as an attendance record, that Boska and Cory attended any such training.

In the end, Wayfair terminated Cory and Boska on November 1, 2018. Each Plaintiff's termination report indicated the following:

> On 10/18/18, Wayfair received notification of unprofessional and inappropriate conduct relating to a Wayfair Service Consultant candidate interview. Upon further review, previous occurrences of this unprofessional and inappropriate behavior were confirmed, specifically within interview form documentation. This behavior qualifies as misconduct under the Wayfair Code of Conduct, which defines such violations as: "Actions detrimental to the best interest of Wayfair. Such actions include any action which impairs the public reputation of the organization or individual staff members or any action which impairs the

successful operation of Wayfair." The Wayfair Code of Conduct also states that "violations may result in appropriate disciplinary action, up to and including termination." This is the course of action being taken.

ECF Nos. 68 at 3, 68-2 at 3.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

The court begins with Wayfair's motion for summary judgment on Cory and Boska's FMLA retaliation claims before turning to Boska's ADA discrimination claim.

## I.  FMLA RETALIATION

The FMLA entitles "an eligible employee" to take up to twelve weeks of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform" his or her position. 29 U.S.C. § 2612(a)(1)(D). Under the FMLA, leave "may [also] be taken intermittently or on a reduced leave schedule when medically necessary." *Id.* § 2612(b)(1).

The FLMA provides that an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."

*Id.* § 2615(a)(2). The Tenth Circuit has "construed this provision of the FMLA as creating a retaliation theory of recovery."[5] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1004 (10th Cir. 2011). It is therefore "unlawful for an employer to retaliate against an employee for taking FMLA leave." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1318 (10th Cir. 2017) (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539-40 (10th Cir. 2014)). "In the typical retaliation claim, the 'employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work.'" *Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1219 n.6 (10th Cir. 2012) (citation omitted). Boska and Cory each assert a cause of action for retaliation under the FMLA, alleging that Wayfair terminated their employment in retaliation for taking FMLA leave.

Courts analyze FMLA retaliation claims using the familiar *McDonnell-Douglas* burden-shifting framework. *See Dewitt*, 845 F.3d at 1318 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973)). Under this framework, the plaintiff must first establish a prima facie case of retaliation. *Id.* at 1307. If the plaintiff satisfies this burden, the employer must offer a legitimate non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *Id.*

### A.     *Prima Facie Case*

To successfully establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) she engaged in a protected activity, (2) she was subject to an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Dewitt*, 845 F.3d at 1318-19 (citation omitted). "The standard for proving a prima

---

[5] The Tenth Circuit has also recognized an interference theory of recovery under the FMLA. Because Plaintiffs do not advance that theory, the court does not discuss it here.

facie case . . . is low." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002). At this stage, the plaintiff need not overcome the defendant's proffered reason. Rather, "[t]he 'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Garrett*, 305 F.3d at 1221).

### i.       Protected Activity

Taking FMLA leave for a serious health condition is a protected activity. *See id.* Both Boska and Cory took FMLA leave. Wayfair does not dispute this element. Accordingly, the undisputed facts demonstrate that both Boska and Cory engaged in a protected activity.

### ii.      Adverse Employment Action

The Tenth Circuit defines an adverse employment action as "an action that a reasonable employee would have found materially adverse." *Id.* Of course, "any reasonable employee would have found termination materially adverse." *Id.* Accordingly, both parties acknowledge that Boska and Cory each suffered an adverse employment action.

But the parties disagree whether the court should consider other disciplinary actions as additional "adverse employment actions." Specifically, Wayfair argues that the court cannot consider warnings, performance improvement plans, and performance evaluation ratings given to Boska[6] for two reasons. First, Wayfair argues that most of the actions are barred by the relevant statute of limitations. Second, Wayfair contends that the actions do not rise to the level of

---

[6] Because the court easily finds that Cory establishes causation via the temporal proximity between her termination and her use of FMLA leave, the court need not consider whether warnings, performance improvement plans, and performance evaluation ratings issued to Cory constitute adverse employment actions.

seriousness required to demonstrate an adverse employment action. The court addresses the second rationale first.

Wayfair issued a number of disciplinary actions to Boska. But two actions stand out for their proximity to Boska's use of FMLA leave. Specifically, within a week of her return from her initial FMLA leave, Boska received a series of performance expectations for the following thirty to sixty days. *See* ECF No. 71-3 at 2. And within a week of returning from her second FMLA leave, Wayfair placed Boska on a performance improvement plan. *See* ECF No. 71-4.

As a general matter, the Tenth Circuit has held that "placement on an employee improvement plan alone does not qualify as a materially adverse action." *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1174 (10th Cir. 2018). Rather, only actions that result in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different duties, or [a decision] causing a significant change in benefits" will constitute an adverse employment action. *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In contrast, "[m]ere inconveniences or alterations of job responsibilities do not rise to the level of an adverse employment action." *Id.*

The PIP in this case appears similar to the employee improvement plan in *Payan*, where the plaintiff alleged retaliation under Title VII and Section 1981. *See* 905 F.3d at 1172-74. There, the Tenth Circuit found that the plan did not constitute an adverse employment action because it "would not cause a reasonable employee to forego exercising his rights under Title VII." *Id.* at 1173. Specifically, the plan's requirements "were not onerous," nor were the tasks required "difficult or especially time-consuming." *Id.* At bottom, the plan was "aimed at improving Mr. Payan's work habits and productivity." *Id.*

Similarly, the performance expectations and PIP in this case are not particularly onerous. The performance expectations required that Boska fulfill basic workplace attendance expectations such as "communicat[ing] any time off needs to her Senior manager prior to taking the time off," ensuring that "[a]ny time away from the office will be either covered by FMLA or PTO," and "not leav[ing] early from [her] regularly scheduled shift unless previously discussed with [her] Senior manager." ECF No. 71-3 at 2. The performance expectations required Boska to "meet performance expectations, including holding all of her formal and informal coaching sessions, attending management meetings, team meetings with her consultants, sending out stats regularly, and keeping her MPM entries up to date." *Id.* Under the "Expectations" section, the PIP outlined basic requirements of Boska's job, such as that Boska "must hold 100% of her one on ones each month with supporting MPM documentation submitted within the same week" and that Boska "must complete all corrective actions from the previous fiscal month by the first Friday of the new month." ECF No. 71-4 at 2. Again, the expected actions were neither onerous nor did they change the basic terms of Boska's employment. *See Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005) ("A reprimand, however, will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment."); *see also Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (recognizing that "formal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered such if they did not affect the employee's grade or salary" (cleaned up)). In essence, both the PIP and performance expectations simply required Boska to do her job.

Nor did the performance expectations or PIP cause Boska to "suffer any change in [her] employment status." *See Lujan v. Johanns*, 181 F. App'x 735, 738 (10th Cir. 2006) (unpublished) (finding no change in employment status where the plaintiff's "job, pay and

benefits all remained the same"). Boska continued to perform the same functions at her job. Accordingly, neither the performance expectations nor the PIP rise to the level of a materially adverse action under 10th Circuit precedent.[7]

In sum, the only adverse employment action for purposes of both Boska's and Cory's FMLA retaliation claim is their termination. Because the court finds that the other disciplinary actions do not rise to the level of adverse employment actions, the court need not reach the question of whether consideration of those actions is time barred.

Nevertheless, even where "past events could not support independent FMLA claims because they did not alter [a plaintiff's] job status and therefore were not serious enough to be materially adverse employment actions," that does not render the facts "irrelevant." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014). Rather, "[e]ven when an incident of alleged employer discrimination or retaliation does not support an independent retaliation claim, it may be relevant as background evidence in a pretext inquiry." *Id.* at 543-44 (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002); *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003)). Accordingly, the court considers prior discipline as part of the context surrounding the causation and pretext inquiries discussed below.

### iii.    Causal Connection

Boska and Cory advance three reasons why the court should find a causal connection between their terminations and their protected activity. First, Boska and Cory argue that the temporal proximity between the protected conduct and termination justifies an inference of a retaliatory motive. Second, Boska and Cory contend that Wayfair's reasoning for terminating Boska and Cory—violating Wayfair policy because of the notes made during their interviews—

---

[7] Nor do Boska's negative performance reviews constitute an adverse employment action.

is demonstrably false. And, third, Plaintiffs argue that Orehoski's animus towards Boska further supports a finding of causation.

### 1) Causal Connection for Cory

The Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to 'justify an inference of retaliatory motive.'" *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (citation omitted); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). But "a plaintiff may rely on temporal proximity alone only if 'the termination is *very closely* connected in time to the protected activity.'" *Metzler*, 464 F.3d at 1171 (citation omitted).

In Cory's case, she returned from her medical leave approximately two weeks before her termination. Such an abbreviated period of time between protected FMLA activity and termination suffices to establish an inference of causation. *See, e.g.*, *id.* at 1171-72 (finding that four to six weeks only is sufficient); *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (holding that a one and a half month period between the protected activity and the adverse action may, by itself, establish causation), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186 (10th Cir. 1998); *c.f. Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (noting that a three-month period, without additional evidence, may not support a finding of causation).

### 2) Causal Connection for Boska

In Boska's case, her last FMLA-related request occurred on September 11, 2017, over a year before her termination. Moreover, in that instance, Boska elected to take short-term disability leave, instead of FMLA leave. Indeed, Boska last returned from FMLA leave nearly

two years before Wayfair terminated her. Boska suffered several other disciplinary actions in close succession to her prior FMLA leave. But, as discussed above, those actions do not constitute adverse actions under Tenth Circuit precedent. Accordingly, Boska must rely on some other method of demonstrating a causal connection between her use of FMLA leave and her termination, beyond mere temporal proximity.

To provide further evidence of causation, Boska proffers Orehoski's demonstrated animus towards FMLA usage. While Wayfair approved several FMLA leaves for Boska, Boska testified that Orehoski subjected her to extensive questioning prior to approving her leave for an endoscopy. Specifically, Boska testified that Orehoski, along with Michelle Erickson, "ask[ed] me numerous questions on why I was having a procedure done, what am I having done, why am I going to be out so long." ECF No. 66-4 at 9. In Boska's view, Orehoski and Erickson were suggesting that "you've already missed so much time, you're now going to miss more?" *Id.* Boska also testified regarding a one-on-one meeting with Orehoski where Orehoski told her that Boska was not being fair to her team members by taking FMLA and putting too much work on their plates. *See* ECF No. 84-2 at 25. Orehoski's behavior was sufficiently concerning to another manager that he raised the behavior to Orehoski's supervisor. *See* ECF No. 85-3 at 6 ("I sent an email to Liz Graham and Kim Orehoski's supervisor at the time . . . basically outlining my concerns with Kim's management and management of the situation.").

And Boska testified that Orehoski demonstrated animus towards other Wayfair employees' use of FMLA. Specifically, Boska testified that Orehoski pressured her to submit termination papers or write-up papers for Boska's team members who had requested FMLA leave before the FMLA documentation went through. *See* ECF No. 84-2 at 25.

Moreover, another supervisor at Wayfair expressed skepticism about Boska's use of FMLA leave. When Boska had to take FMLA leave due to a scheduled surgical procedure, Dunn complained that Boksa's leave "conveniently lines up with the holidays" which builds a perception of "not being committed to the team." ECF No. 87-2 at 2. Moreover, in her complaint to HR, Boska said that she "was also told by management that other managers feel I am slacking due to not being in the office or working while out on medical leave." ECF No. 85-5 at 2. Accusations of slacking while on medical leave suggests an animus towards Boska's use of FMLA.

This backdrop of a demonstrated animus towards Boska's use of FMLA leave, as well as Wayfair's decision to place Boska on improvement plans immediately following her use of FMLA, creates an inference that Wayfair wanted to terminate Boska due to her use of FMLA leave, and that the company simply waited until it found what it believed to be a bulletproof rationale to terminate her. Accordingly, Boska has produced sufficient evidence to establish a prima facie case of causation.[8]

*                 *                 *

With the close temporal proximity between Cory's use of FMLA and her termination, and the prior demonstrated animus towards Boska's use of FMLA leave, both Cory and Boska have made out a prima facie case of FMLA retaliation. The court now turns to whether Wayfair can establish a legitimate non-discriminatory reason for the terminations.

---

[8] Because the court need not consider whether Wayfair's cited reason for Boska and Cory's termination—discrimination in their interview practices—was false in order to determine that Boska and Cory successfully established causation, the court leaves that argument for the pretext section.

### B.       *Legitimate Non-Discriminatory Reason*

Both parties agree that Wayfair's proffered non-retaliatory reason for terminating Boska and Cory—that Plaintiffs violated company policy by referring to age and medical status in interview notes—satisfies Wayfair's burden at this stage of the analysis.

### C.       *Pretext*

A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e., unworthy of belief, (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances, or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision that affected the plaintiff. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

In addition to advancing several new arguments, Boska and Cory incorporate their causation arguments into their pretext section. Accordingly, Plaintiffs raise the following four arguments to establish pretext: (1) temporal proximity between the protected conduct and termination justifies an inference of a retaliatory motive; (2) Wayfair's reasoning for terminating Boska and Cory—violating Wayfair's Code of Conduct because of the notes made during their interviews—is demonstrably false; (3) Orehoski's animus; (4) the alleged sham investigation into the interviews.

### (i)       **Temporal Proximity**

As the court noted above, only Cory can show temporal proximity between her use of FMLA leave and her termination. But while close temporal proximity can establish causation, it cannot, alone, establish pretext. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172

(10th Cir. 2006) ("[T]his court has refused to allow even 'very close temporal proximity to operate as a proxy for the evidentiary requirement' that the plaintiff demonstrate pretext." (citation omitted)); *see also Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) ("Although we may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." (citations omitted)). Therefore, while this factor weighs in favor of a pretext finding for Cory, the court must consider the remaining evidence of pretext offered by Plaintiffs to determine if they have met their burden.

### (ii)      Reason for Termination

The reason cited for termination—that Cory and Boska recorded discriminatory notes in violation of Wayfair policy—finds only weak support in the record. Wayfair points to two interviews where it contends that Cory and Boska allegedly documented discriminatory notes. First, Wayfair cites Boska and Cory's decision to write down that "[h]e is discriminatory again[st] age." ECF No. 67-2 at 3. But noting that a candidate discriminates against other individuals because of their age is simply not prohibited by Wayfair's equal employment opportunity policies. Ironically, such a note appears aimed at protecting the candidate's potential future co-workers from discrimination that *is* prohibited by Wayfair's EEO policies.

Second, Wayfair cites Boska and Cory's note, in a different interview, that the candidate "[m]entioned some medical problems that have prevented her from coming to work and or leave [sic] work early." ECF No. 67-3 at 3. As an initial matter, Boska and Cory's note did not affect Wayfair's decision-making; the company ultimately hired the candidate. But, more importantly, absent any training to the contrary, Boska and Cory simply could not have known that they were not permitted to document this information. Boldman testified that the concern with this

comment "was the fact it was documented that she had said it, more than if the question had been asked or not." ECF No. 67 at 8. He testified that the proper procedure would have been to refer the candidate to HR to discuss the medical issue, not to document the medical issue in their interview notes. However, there is no documentary evidence that Wayfair ever trained Boska and Cory on this proper procedure.

In essence, Plaintiffs believe that Wayfair terminated them for a violation of a policy about which they were never notified or trained. Wayfair counters that "[a]n employer's exercise of erroneous or even illogical business judgment does not constitute pretext." *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995). In Wayfair's view, even if Wayfair's human resources department erroneously believed that Boska and Cory received proper training prior to the interviews they conducted, Wayfair still terminated them under a reasonable belief. Defendants reiterate that when considering pretext, the question is not "whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *See Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (citation omitted and cleaned up).

But the evidence does suggest that Wayfair's rationale may have been pretextual. First, Wayfair presents very little evidence that Boska and Cory underwent training regarding how to properly conduct interviews. Wayfair concedes that the company has no written record that Boska and Cory attended any such training. *See* ECF No. 67 at 4. Moreover, Wayfair produces no PowerPoints, handouts, or other evidence regarding the contents of any alleged trainings. *See id.* at 3 ("Q: Are you aware of any documents that would outline the actual training that Ms. Boska or . . . Ms. Cory received? A: I was not able to find any."). Instead, Wayfair relies on Boldman's testimony that Orehoski told him that she had covered the responsibility not to record

medical information in the interview notes. *Id.* ("Q: Now, did Ms. Orehoski tell you that she had covered this type of training with them specifically? A: Yes."). But when asked in her deposition about whether she provided interview training to Boska and Cory, Orehoski said "[n]ot myself personally." ECF No. 85-2 at 29. Rather, Orehoski testified that "[o]ur talent department would have done that." *Id.* But Boldman testified that the talent development group could not corroborate whether or not any training was actually provided to Boska and Cory. ECF No. 67 at 4.

Wayfair argues that "Boldman considered whether Plaintiffs would have likely been trained and should have known better." ECF No. 92 at 11. But Boldman relied, in large part, on Orehoski's representation that she trained Plaintiffs on the type of information appropriate to record during interviews. And given the animus discussed above, a reasonable jury could infer that Orehoski simply lied about the training. The court agrees that Wayfair is generally not liable for a business judgment based on erroneous information. But when the information is erroneous not merely because the company misunderstood the situation but rather because a senior manager purposefully lied to the HR department, that certainly raises an inference of pretext. In other words, the court looks to whether the employer "honestly believed" the given reasons for termination and whether the employer "acted in good faith upon those beliefs." *Lobato v. N.M. Env. Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (citation omitted). But Wayfair cannot claim an honestly held belief to the extent it developed its belief based on misrepresentations by a Wayfair manager. Of course, it is not the court's responsibility to adjudicate credibility issues on a motion for summary judgment. Accordingly, a genuine issue of material fact remains as to whether the reasons cited by Wayfair were pretextual.

### iv.    Animus

The court has already discussed animus in the context of causation. But the court highlights an additional case to which this case bears some resemblance. In *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 543-44 (10th Cir. 2014), the Tenth Circuit held that past events, including negative ratings on recent performance evaluations, attempts to change shifts, and ongoing complaints about an employee's FMLA-protected absences, although not the adverse action at the center of the litigation, could still serve as evidence of pretext. Specifically, the Tenth Circuit held that such actions can "lend[] further support to the inference that [the company] was frustrated with [the plaintiff's] use of FMLA leave and seized upon [particular misconduct] as a pretext to fire him and avoid the inconvenience caused by his FMLA-protected absences." *Id.* at 544.

Here, Wayfair engaged in a number of actions that correspond to the actions in *Smothers* and suggest an animus towards Plaintiffs', and in particular, Boska's, use of FMLA leave. First, in *Smothers*, a manager "admitted that he tried to force [the plaintiff] to change shifts." *Id.* Similarly, Dunn and Orehoski moved Boska to a new shift immediately after her return from her second FMLA leave. Dunn and Orehoski moved Boska to managing a "closing shift team," meaning that Boska then had to work on Saturdays. More importantly, Boska testified that the new team was the "worst team on the floor" with "the lowest stats." ECF No. 84-2 at 27. And Boska testified that, prior to her assignment to the closing shift team, it "was a rule before, like closing shift gets new managers," not a more senior manager such as Boska. *Id.*

Second, *Smothers* also highlighted as relevant "negative ratings on [the plaintiff's] recent performance evaluations expressly because of his FMLA-protected absences." 740 F.3d at 544. Similarly, Boska received performance expectations and a performance improvement plan nearly

immediately after returning from each of her FMLA leaves. After providing a series of numerical metrics, such as requiring a certain number of email transcript audits per week—metrics that could prove hard to accomplish while simultaneously taking leave—the PIP specifically states (in a clear reference to Boska's use of FMLA leave) that "[t]ime away from work will not excuse performance standards." ECF No. 71-4 at 2.

While each of these instances do not directly correspond to the termination, they form part of the background context that the court considers in finding that a genuine issue of material fact remains as to pretext.

### v.      Sham Investigation

Finally, Plaintiffs argue that the investigation into Boska and Cory's allegedly discriminatory interview practices further supports a finding of pretext. As evidence, Boska and Cory point to the fact that "Wayfair did not interview, obtain statements, or otherwise ask Plaintiffs why they did what they did." ECF No. 83 at 55-56. The court agrees.

"A 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext." *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (quoting *Smothers*, 740 F.3d at 542). In describing the leading Tenth Circuit case on fair investigations, the Tenth Circuit held that, "the plaintiff presented a triable fact issue concerning pretext, in part, because the employer relied on one-sided information about a quarrel between the plaintiff and another employee and deliberately prevented the plaintiff from responding to the allegations against him." *Gupta v. Okla. City Pub. Schs.*, No. 21-6138, 2022 WL 1742048, at *6 (10th Cir. May 31, 2022) (citing *Smothers*, 740 F.3d at 542-43). However, "an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by simply asking an employee for his version of

events." *DeWitt*, 845 F.3d at 1314 (citation omitted); *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (declining to find an inadequate investigation where, "[i]mportantly, in the course of his investigation [the decision-maker] asked the [plaintiff-employee] to give his version of the [events]")).

But Wayfair failed to give Boska and Cory the opportunity to convey their version of events during its investigation. *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1199-1200 (10th Cir. 2021) ("[A] factfinder can reasonably infer pretext from an employer's failure to inquire into the reasons for an employee's behavior."). Indeed, Wayfair appears to have given significant weight to a conversation with a candidate that the company decided not to hire while entirely failing to engage with Boska and Cory's version of events. Had Wayfair inquired into Boska and Cory's rationale, they would have likely discovered the entirely non-discriminatory reason for which Plaintiffs mentioned age on the interview form—to highlight the candidate's inappropriate discrimination based on age. *See id.* at 1200 (finding pretext where employer failed to give the employee an "opportunity to explain" which could have led to different inferences on the part of the employer). Accordingly, here Wayfair's "failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action" supports an inference of pretext. *See DeWitt*, 845 F.3d at 1314 (citation omitted).

*       *       *

In sum, viewing the evidence in the light most favorable to Boska and Cory, the court finds that a reasonable jury could conclude that Wayfair acted pretextually in firing Boska and Cory. Accordingly, the court DENIES summary judgment on Boska's and Cory's FMLA retaliation claim.

## II.    ADA DISCRIMINATION

Wayfair also moves for summary judgment on Boska's ADA discrimination claim. "The ADA prohibits employers from discriminating against 'a qualified individual on the basis of disability.'" *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015) (quoting 42 U.S.C. § 12112(a)). "The burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) generally applies to ADA disparate treatment claims."[9] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003). As noted above, *McDonnell Douglas* requires that the plaintiff first raise a genuine issue of material fact on each element of the prima facie case, at which time the burden shifts to the defendant to offer a legitimate non-discriminatory reason for its employment decision. If the defendant can articulate a non-discriminatory reason, the burden shifts back to the plaintiff to show a genuine issue of material fact as to whether the defendant's stated reason is pretextual.

"To establish a prima facie case of discrimination under the ADA, an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004). As with FMLA retaliation, establishing a prima facie case for ADA discrimination is "not onerous." *Osborne*, 798 F.3d at 1266 (citation omitted).

Wayfair does not dispute the first two prongs. Boska had a disability within the meaning of the ADA and she was qualified to perform the essential functions of the job. And Wayfair

---

[9] "If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n.3 (10th Cir. 1997). Because that is not the case here, the court applies the *McDonnell Douglas* burden-shifting framework.

advances similar arguments on the causation prong. But for the same reasons cited above, Boska can establish causation for the purposes of a prima facie case.

Finally, Wayfair offers the same legitimate non-discriminatory reason—that Wayfair's decision to terminate Boska was in compliance with its EEO policies based on the interview notes.

In the court's analysis of Boska and Cory's FMLA claims, the court determined that Plaintiffs demonstrated a genuine issue of material fact as to whether Wayfair's stated reasons for firing them—the allegedly discriminatory interview notes—were pretextual. "When a plaintiff demonstrates that an employer's proffered reasons are 'unworthy of credence,' a jury may 'infer the ultimate fact of discrimination' or retaliation." *Smothers*, 740 F.3d at 546 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)). Thus, the showing of pretext for purposes of Boska's FMLA claim extends to her ADA claim.

## CONCLUSION

The court DENIES Wayfair's motion for summary judgment.


DATED July 22, 2022.

BY THE COURT

Jill N. Parrish
United States District Court Judge